# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Parental Rights to

K.G.O.

No. 85453-4-I

DIVISION ONE

UNPUBLISHED OPINION

BIRK, J. — R.O. appeals from an order terminating her parental rights to her daughter K.G.O. R.O. has a history of long-term methamphetamine use, anxiety, and depression. Over almost three years during the dependency case, R.O. attempted and failed to complete several drug treatment programs and relapsed several times. The trial evidence was for the most part lacking in specific reasons why R.O.'s drug use interfered with her ability to provide for K.G.O.'s needs, making this record a close case. Nevertheless, given this court's deferential standard of review, we conclude substantial evidence supports the trial court's findings and conclusions that R.O. is currently unfit to parent K.G.O. and that termination of R.O.'s parental rights is in K.G.O.'s best interests. We affirm.

I

R.O. is K.G.O.'s biological mother.[1] R.O. has another child residing in her care, M.S., who is not a party to this dependency or termination action. K.G.O.'s

---

[1] The substantive facts in this opinion are drawn from the termination trial testimony, exhibits, and the trial court's unchallenged findings of fact. Unchallenged findings of fact are accepted as true on appeal. In re Dependency

biological father died one month after K.G.O. was born. R.O. first started using drugs when she was 11 years old. During her pregnancy with K.G.O., R.O. used methamphetamines "more than a handful of times," including three days before K.G.O. was born. The first treatment attempt by R.O. evidenced in the record is in January 2020, before K.G.O. was born, when R.O. testified she attended and completed 28 day inpatient treatment to try to stop using while pregnant with K.G.O.

K.G.O. tested positive for methamphetamines at birth. On June 23, 2020, K.G.O. was removed from her parents' custody by court order and placed with her paternal uncle, where she remained at the time of the March 2023 termination trial. The same day, the Department of Children, Youth, and Families (Department) filed a dependency petition pursuant to RCW 13.34.030(6)(b) and (c). On June 30, 2020, a court entered an agreed shelter care hearing order. The court found that "[s]pecific services offered or provided to the parent(s) have been unable to remedy the unsafe conditions in the home and make it possible for the child to return home." R.O. agreed to participate in drug/alcohol evaluation and follow recommendations, random UA (urinalysis) testing, parenting classes, individual counseling, and a mental health assessment.

R.O. attempted treatment at Evergreen Recovery Centers (ERC). ERC's Treatment Director Brian Bononi testified at trial. ERC's Pregnant and Parenting Women's (PPW) program is a six month inpatient substance use treatment

---

of A.N.C., 24 Wn. App. 2d 408, 416, 520 P.3d 500 (2022), review denied, 1 Wn.3d 1012, 532 P.2d 1024 (2023).

program geared towards pregnant or parenting women. Mothers engage in drug and alcohol education, parenting skills education and coaching, mental health counseling, infant mental health counseling, and relapse prevention planning. Children can be placed with their mothers in treatment. Co-occurring mental health and substance use disorder treatment is available at ERC. R.O. engaged in substance use treatment, mental health counseling, and parenting classes while at ERC, but was discharged after one month when she was caught with heroin in the treatment facility. R.O. stated she believed she could use heroin because her problem was with methamphetamine.[2]

In August 2020, R.O. completed an intake with the Snohomish County Parent-Child Assistance Program (PCAP). Debbie McBrayer was assigned as her case manager and helped R.O. access services after that assignment. PCAP is a three year program to support pregnant and parenting women in recovery to be able to provide a stable, healthy home. PCAP providers help mothers navigate the child protective services (CPS) and legal systems, make social connections, get drivers licenses or state IDs, and find housing. In addition to court ordered and necessary services, R.O. accessed numerous ancillary services both through the Department and in the community. McBrayer started observing visits between R.O. and K.G.O. in September 2020.

---

[2] There is an unchallenged finding of fact of a treatment attempt in June 2020, but Bononi denied a record of treatment at ERC in June 2020. R.O. testified that a September-November 2020 treatment attempt at ERC (noted below) was the one from which she was discharged because of heroin possession. It is unclear whether R.O. made one or two attempts at treatment at ERC in the latter half of 2020.

K.G.O. was found to be dependent under RCW 13.34.030(6)(c) by agreed order in September 2020. The court ordered R.O. to complete the following services and to follow the recommendation of evaluators and service providers: Drug/alcohol evaluation, parenting classes, and a mental health assessment. The order noted, "[R.O.] acknowledges substance use history and has a bed date on 9/29/20. [R.O.] agrees the services and disposition are necessary and appropriate." At the time of the dependency order, R.O. was awaiting an inpatient treatment bed date at ERC PPW. The court entered a separate order pursuant to RCW 13.34.130 that maintained K.G.O. in out-of-home care. R.O. began a treatment attempt at ERC on September 29, 2020. By November 2, 2020, R.O. had relapsed and left the facility.

In May 2021, R.O. entered inpatient treatment at Isabella House. Isabella House is a substance use treatment facility in Spokane, Washington. Jennifer Matson, an Isabella House substance use disorder professional, testified at trial. Isabella House offers residential substance use treatment for pregnant and parenting women. The facility is fully licensed for childcare, offers substance use treatment and co-occurring treatment, and offers transitional planning and housing assistance to patients. At entry, R.O. reported using methamphetamines and heroin on a daily basis prior to entering detox, which she had completed prior to entering treatment. R.O. reported no signs or symptoms of withdrawal. Three days after entering treatment at Isabella House, R.O. discharged herself due to feeling anxious and used heroin that night.

4

Substance use disorder treatment levels are assessed when the patient enters treatment based on American Society of Addiction Medicine and DSM-V[3] diagnostic criteria. At the time of discharge from Isabella House, R.O. was recommended to reengage in level 3.3 substance use disorder treatment. Level 3.3 refers to inpatient substance use disorder treatment and indicates that the patient has an inability to remain sober outside of a controlled environment.

In June 2021, R.O. entered ERC's PPW program. R.O. had used methamphetamines and heroin in the days prior to entering treatment. R.O. engaged in substance use treatment, mental health counseling, infant mental health counselling, and parenting classes. R.O. received methadone and a nicotine patch daily. R.O. attended weekly mental health counseling sessions with a mental health intern at ERC from June to December 2021.

On July 22, 2021, the Department filed a petition for termination of R.O.'s and K.G.O.'s parent-child relationship. This petition, later amended on August 30, 2021, claimed R.O.'s parenting deficiencies included mental health issues, substance abuse issues, and lack of parenting skills.[4] A Department caseworker, Hannah Pennington, testified the Department filed the petition because R.O. "still had not mitigated the identified safety threat on the case, and she had not mitigated her parental deficiencies." Pennington explained the safety threat of R.O.'s substance use was that R.O. "will not or cannot control [her] behavior and [her]

---

[3] AM. PSYCHIATRIC Ass'n, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (5th ed. 2013).

[4] The Department originally relied on criminal activity and lack of safe and stable housing, but by the time of trial the Department no longer relied on these asserted deficiencies.

behavior impacts [K.G.O.'s] safety." In its termination petition, the Department claimed R.O. was "currently unfit to parent," because she had "significant substance abuse that will require long-term treatment," she tested positive several times for UAs, and she failed to complete substance use treatment despite numerous attempts to do so. According to the Department, these deficiencies showed R.O. had "not demonstrated the ability to care for her child," "does not understand and is incapable of providing for [K.G.O.]'s emotional, physical, mental, and development needs," and "is incapable of safely parenting the child."

In October 2021, R.O. stabilized in treatment at ERC and K.G.O. was placed with R.O. That month's status report noted R.O. "received consequences for not completing room and house chores." In December 2021, days before R.O. was set to graduate from the PPW program, she provided a positive UA and was discharged due to denying substance use. ERC policy states that patients who provide a positive UA but do not admit to substance use will be discharged. The rationale behind this policy is that failing to discharge those patients risks perpetuating that behavior. R.O.'s early discharge from ERC led to K.G.O. being removed from her care and placed back with her paternal uncle. At time of discharge, R.O. was diagnosed with "Stimulant Use Disorder (Other or unspecified stimulant) Severe F-15.20, Opioid Use Disorder-Severe F-11.20 and Alcohol Use Disorder-Mild F-10.10." R.O.'s anticipated level of care at time of discharge was Level 3.3, and she was recommended to enter into "Clinically Managed Population-Specific High-Intensity Residential Services" to receive the treatment needed to achieve and maintain long-term sobriety. R.O. used within an hour of

6

being discharged because she was heartbroken and extremely upset about being removed from the program.

In January 2022, R.O. engaged in intensive outpatient substance use disorder treatment at Catholic Community Services (CCS). CCS is a nonprofit organization that offers substance use disorder treatment, mental and behavioral health services, and housing assistance. Co-occurring disorder treatment is available at CCS.

PPW Intensive Outpatient (IOP) at CCS provides a curriculum that involves group and individual counseling sessions. Patients learn parenting skills as part of the PPW program. CCS tracks patient progress through group sessions, individual counseling, and treatment plans. Progress reports are generated monthly. R.O. engaged in group sessions three times per week, individual sessions with her substance use counselor once per month, and monthly UAs. During a group session in January 2022, R.O. self-reported that she used methamphetamine and heroin on January 3, 2022.

At a review hearing in April 2022, the court ordered random UA testing to occur at least once monthly. Pennington testified UAs are the primary way the Department assesses sobriety.

While R.O. achieved compliance with treatment at CCS in February 2022, she fell out of compliance in April 2022 due to unexcused absences and substance use. In May 2022, R.O. was not in compliance with treatment at CCS due to substance use. In June 2022, R.O. was not in compliance with treatment at CCS due to unexcused absences and self-reported substance use. In July 2022, R.O.

7

was not in compliance with treatment at CCS because of unexcused absences and a missed UA. A termination trial was initially set in July 2022, but was continued by agreement of the parties to November 2022. In August 2022, R.O. had unexcused absences from treatment. CCS discharged R.O. from IOP treatment in October 2022 because of lack of compliance and engagement. R.O. reengaged with substance use treatment at CCS the day after her discharge.

Sometime in the fall of 2022, R.O. used methamphetamines because she had recently lost her mother, "which was extremely hard." The sequence of events is not clear, but R.O. attributed her difficulty in completing treatment and in maintaining sobriety to several stressors in 2022, including the death of her mother, having COVID-19, having an infection resulting in lost mobility due to reestablishing use of her prosthetic leg, and a fellow occupant of a clean house dying from an overdose.

McBrayer started Promoting First Relationships (PFR) with R.O. in October 2022. PFR is a 10 week parenting program designed to support parents in reading children's cues. McBrayer provided handouts with information on how to separate from the child well at the end of a visit, how to read the child's cues, how R.O. could read her own cues, and how to recognize when R.O. was not meeting the child's needs. McBrayer observed visits and captured video of R.O. and K.G.O. She would then go over the video with R.O. and provide coaching. By the time of the termination trial, R.O. had not yet completed PFR. At trial, Pennington expressed concern that it had taken R.O. almost a year to complete a 10 week program.

In November 2022, R.O. was not in compliance with treatment at CCS due to unexcused absences and self-reported methamphetamine use. The termination trial set to start on November 8, 2022 was continued again by agreement of the parties to March 2023. R.O. testified she reported to Pennington that she relapsed in November 2022.

In December 2022, R.O. was not in compliance with treatment at CCS due to unexcused absences and substance use. At the termination trial, R.O. testified she believed she had had methamphetamine cut with fentanyl, which resulted in a positive UA result. R.O. reported issues with Hopelink and medical appointments as the reason for her absences, but never provided a doctor's note or documentation to CCS to excuse these absences. Hopelink is a wheelchair-accessible community transportation resource that can provide transportation for parents. R.O. could have participated in her sessions at CCS virtually and was offered random UAs.

R.O. never provided a random UA for the Department. R.O. testified she completed "probably less" than 12 UAs with CCS since January 2022 because of her absences. By the time of the termination trial in March 2023, there were no current UAs since at least January 2023. R.O. testified that she could not complete random UAs for the Department because she did not have an ID (identification card). R.O. testified she lost her ID because she was in a wheelchair and it took time to get the funds for a replacement. She lost her ID a second time, but the new ID had not come by the time of trial. Pennington provided R.O. with funds to obtain a new ID in March 2022 and January 2023. R.O. never followed up to find

9

out why her ID being issued was delayed. R.O. never asked McBrayer for help getting an ID. The trial court found this explanation for not providing UAs not credible.

At the time of trial, R.O. was engaged in IOP counseling at CCS in Marysville. She had been engaged in this service for three months. R.O.'s level of care at entry was 2.1, which corresponds to intensive outpatient treatment. R.O. was prescribed medication to address depression through her primary care provider, she had been taking that medication for six months, and it was effective.

On March 17, 2023, CASA (court appointed special advocate) Kalyani Sendil submitted her report and recommended R.O.'s parental rights be terminated and K.G.O.'s current caregivers be allowed to adopt her. The termination trial ran from March 20, 2023 through March 22, 2023. Through trial, R.O. reengaged with CCS IOP.

At trial, there was evidence of the history of services offered, in particular mental health services. R.O. was offered and provided a mental health assessment and treatment. Pennington provided R.O. with information on how to access mental health services, including lists of providers with contact information, in service letters, and going over those letters with R.O. in person. R.O. completed a mental health evaluation at Therapeutic Health Services (THS) in early 2022, but saw that provider only two or three times. R.O. started a mental health evaluation at SeaMar, a community health center, a few months prior to the trial. She did not complete the evaluation. Pennington testified R.O. "reported that her mental

10

health continues to be a barrier for her" and "part of the reason why she struggles with mental health is because [K.G.O.] is not in her care."

R.O. had access to housing support services through ERC, Isabella House, CCS, and PCAP. At the time of the trial court's findings, R.O. resided in Maud's House, a sober housing facility, where she shared a room with her 17 year old son, M.S. R.O. had an approved housing voucher and a two bedroom apartment ready since August 2022. R.O. did not know when she would be able to move in. The reason for the delay was unknown, except that it was not within R.O.'s control. Transportation and medical issues were barriers to accessing services for R.O. over the summer and fall 2022.

Pennington sent R.O. service letters every month. Pennington went over one quarter of those service letters in their entirety with R.O. in person. Pennington frequently discussed with R.O. what R.O. needed to do for K.G.O. to be returned to her care. R.O. understood that she needed services in order to have K.G.O. back in her care.

K.G.O. has special needs and receives occupational therapy, speech and language therapy, and mental health services. She uses a leg apparatus for left leg weakness. By the time of trial, K.G.O.'s mental health therapist, Sarah Branson, had been working with K.G.O. for about one year. Branson testified she works on emotion regulation and supporting transitions throughout K.G.O.'s day, particularly between caregivers. Branson testified K.G.O. struggles at times with emotion regulation and while all toddlers can have tantrums, K.G.O. "can have bigger responses than would be typical for other two-year-olds." "Some days

11

[K.G.O.] can be more irritable." When Branson first met K.G.O., K.G.O. would engage in some self-harm behaviors, such as hitting herself. K.G.O. had improved since they first met in some areas, such as transitioning between activities and going to childcare. Branson testified she spoke with R.O. over the phone two or three times and discussed K.G.O. and the services she had been receiving. R.O. did not attend any of K.G.O.'s therapy sessions.

On May 19, 2023, the trial court entered its findings and order regarding termination of the parent-child relationship. The court found R.O. was provided parenting education, which was a court ordered service. R.O. engaged in parenting education while in PPW treatment, including PPW Parenting, Parenting Trust, and Interactive Parenting. The foreseeable future for K.G.O. is, at most, three months. The court found there are no other services reasonably available and capable of correcting R.O.'s parental deficiencies such that K.G.O. could be returned to R.O.'s care within the next three months. The court's oral ruling explained the evidence showed a "pattern" of R.O. relapsing to cope when under stress (with particular reference to relapsing after the death of her mother). K.G.O.'s current caregivers are ready, willing, and able to provide K.G.O. with a permanent home. The only barrier to adoption is the existence of R.O.'s parental rights.

II

R.O. appeals and assigns error to 15 findings of fact.[5] R.O. argues the Department failed to prove she was unfit to parent or unlikely to be able to safely reunite with K.G.O. in the near future. R.O. argues the trial court erred in finding termination was in the best interests of the child. The State contends substantial evidence supports the trial court's findings of fact and associated conclusions.

Under chapter 13.34 RCW, to terminate parental rights, the Department must first establish the six elements of RCW 13.34.180(1), and it must second establish that termination of parental rights would be in the child's best interests. In re Parental Rights to K.M.M., 186 Wn.2d 466, 478, 379 P.3d 75 (2016). The Department must prove those allegations by clear, cogent, and convincing evidence. Id.; RCW 13.34.190(1)(a)(i). Clear, cogent, and convincing evidence exists when the ultimate fact in issue is shown to be " 'highly probable.' " In re Welfare of Sego, 82 Wn.2d 736, 739, 513 P.2d 831 (1973) (quoting Supove v. Densmoor, 225 Or. 365, 372, 358 P.2d 510 (1961)). Due process additionally requires that a court make a finding of current unfitness before parental rights can be terminated. K.M.M., 186 Wn.2d at 479. "There is no statutory definition of 'unfitness,' but the statutory elements of RCW 13.34.180(1) 'necessarily and

---

[5] We decline to review two challenged findings of fact, finding of fact 2.102 that mental health treatment is a necessary service and finding of fact 2.199 concerning delay in R.O.'s progress prolonging K.G.O.'s wait for stability. R.O. does not provide argument supporting her claim of error in these findings. See Holland v. City of Tacoma, 90 Wn. App. 533, 538, 954 P.2d 290 (1998) (declining review for lack of reasoned argument); Jackson v. Quality Loan Serv. Corp., 186 Wn. App. 838, 845, 347 P.3d 487 (2015) ("An appellate court will not consider a claim of error that a party fails to support with legal argument.").

implicitly include[ ] evidence of current parental unfitness.'" Id. at 490 (alteration in original) (quoting In re Dependency of K.R., 128 Wn.2d 129, 142, 904 P.2d 1132 (1995)). "[I]f all of the requirements of RCW 13.34.180(1) have been met, there is an implied finding of parental unfitness." Id. Once the court determines that the Department satisfied its requirements in accordance with RCW 13.34.180(1), parental rights may be terminated if doing so is in the best interests of the child. RCW 13.34.190(1)(b). The Department must prove that termination is in the best interests of the child by a preponderance of the evidence. K.M.M., 186 Wn.2d at 479.

We give the trial court's decision great deference and will uphold its findings of fact if they are supported by substantial evidence. In re Dependency of G.G., 185 Wn. App. 813, 828, 344 P.3d 234 (2015). If substantial evidence supports the trial court's findings in light of the degree of proof required, an order terminating parental rights must be affirmed. In re Dependency of T.R., 108 Wn. App. 149, 161, 29 P.3d 1275 (2001). Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the truth of the declared premise. In re Welfare of E.D., 195 Wn. App. 673, 688, 381 P.3d 1230 (2016). We do not weigh the evidence or judge the credibility of witnesses. In re Welfare of M.R.H., 145 Wn. App. 10, 24, 188 P.3d 510 (2008).

A

As to step one under K.M.M., R.O.'s challenges to the trial court's findings center on one of the six elements: "That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future."

14

RCW 13.34.180(1)(e). "The focus of this factor is 'whether parental deficiencies have been corrected.' " In re Dependency of S.M.H., 128 Wn. App. 45, 55, 115 P.3d 990 (2005) (quoting K.R., 128 Wn.2d at 144). In determining whether the conditions will be remedied, the trial court may consider the use of intoxicating or controlled substances so as to render the parent incapable of providing proper care for the child for extended periods of time or for periods of time that present a risk of imminent harm to the child, and documented unwillingness of the parent to receive and complete treatment or documented multiple failed treatment attempts. RCW 13.34.180(1)(e)(i). This provision permits a court to consider a parent's use of intoxicating or controlled substances as a factor in determining whether the " 'conditions will be remedied' " in the near future. See In re Dependency of J.C., 130 Wn.2d 418, 427, 924 P.2d 21 (1996) (quoting former RCW 13.34.180(5) (1993), recodified as RCW 13.34.180(1)(e) (LAWS OF 2000, ch. 122, § 25)).

The court may consider the parent's history of parenting and compliance with services to determine whether conditions are likely to be remedied in the near future. E.D., 195 Wn. App. at 689. A determination of what constitutes " 'near future' " depends on the child's age and the circumstances of the placement. Id. (quoting In re Dependency of T.L.G., 126 Wn. App. 181, 204, 108 P.3d 156 (2005)). A matter of months for young children is not within the foreseeable future to determine if there is sufficient time for a parent to remedy his or her parental deficiency. M.R.H., 145 Wn. App. at 28.

R.O. challenges finding of fact 2.18, which states,

The child was removed from the custody of the parents by court order on June 23, 2020, where she remains to date. The child was removed due to active substance use by the parents and a lack of safe and stable housing.

R.O. argues this finding of fact is not supported by substantial evidence because by the time of trial, the Department and the social worker admitted housing was no longer an issue and did not impact R.O.'s ability to safely parent her child and that she had safe, stable housing. This finding speaks to the reasons why K.G.O. was removed from the custody of her parents in June 2020. Exhibit 4, the agreed dependency order, states K.G.O. is dependent because she "has no parent . . . capable of adequately caring for [her], such that [K.G.O.] is in circumstances which constitute a danger of substantial damage to her psychological or physical development" and "[t]he health, safety, and welfare of [K.G.O.] cannot be adequately protected in the home." R.O. had been living in a "tent city" and used methamphetamines just three days before K.G.O. was born. Substantial evidence supports finding of fact 2.18.

R.O. challenges finding of fact 2.26, which states,

[R.O.]'s parenting deficiencies include mental health issues, substance abuse issues, and lack of parenting skills.

R.O. argues the trial court erred by finding her parental deficiencies included mental health issues and lack of parenting skills.

As to mental health, the agreed dependency order required R.O. to obtain a mental health assessment along with a drug/alcohol evaluation, parenting classes, and to follow all recommendation of evaluators and service providers. At

trial, R.O. agreed that she experiences anxiety and depression. Anxiety sometimes makes it hard for R.O. to function, gets her "really agitated," and causes her to experience panic attacks. Depression makes it hard for R.O. to get out of bed. When asked what she thinks she needs to do to address those mental health issues, R.O. stated, "Keep going to my therapy and keep up with meds." R.O. noted her triggers include the people she used to surround herself with, mental health, and grief.

Pennington stated that the Department's concern about R.O.'s mental health issues is not R.O.'s ability to be a safe parent, but being a "proactive" parent. Pennington agreed that R.O. can keep K.G.O. safe despite the mental health issues R.O. is concerned about. Pennington testified, "We encourage [R.O.] to continue with the mental health assessment that she was working on at Sea Mar [sic], and to engage in mental health counseling, if that's what was recommended by the provider."

Pennington testified there were concerns about the environment that R.O. had K.G.O. in at ERC. Pennington observed she was not able to see the floor in R.O.'s room and was concerned about room cleanliness. Specifically, the dirty and cluttered floor troubled Pennington because "[she] couldn't see what was underneath the clutter, and so [she] wasn't sure if there was any safety hazard." These observations took place in the controlled environment of PPW's facility and prompted Pennington to talk to R.O. about the Department's concern and the importance of having a clean and safe space for K.G.O. Pennington described similar safety concerns during R.O.'s time at Maud's House in that the "room was

17

very cluttered, couldn't see the floor," and the refrigerator was placed on top of the dresser. Pennington considered the refrigerator placement a safety hazard since it could have fallen and injured K.G.O., as it was not secured onto the dresser. The first time Pennington raised this issue with R.O., R.O. did not understand Pennington's concerns. Pennington opined R.O. is not able to safely parent K.G.O. for extended periods of time because R.O. "has demonstrated that she can't be a safe parent in a controlled environment" and "there is a big difference between visitation for nine hours a week and being a full-time parent 24/7."

As to substance use, R.O. agreed that substance use can make one less capable of parenting, and when asked if it has made her less capable of parenting, she replied, "I guess." While R.O. had unsupervised visits with K.G.O. and had her returned to her care from October 2021 to December 2021 while in inpatient treatment, the return to R.O.'s care ended because R.O. provided a positive UA and was discharged from EPC's PPW after denying use. CASA Sendil testified that her concern was mostly about how R.O. would manage K.G.O. the whole time, help with K.G.O.'s needed services, and remain sober to take care of K.G.O. The CASA stated that as a three year old (at the time of trial), K.G.O. needed "a lot of attention and time" and the CASA was "not sure" if R.O. would be able to provide that. In the context of the reference to R.O.'s maintaining sobriety, this supports the inference that R.O.'s pattern of relapse was inconsistent with having the consistent ability to provide the necessary care and services for K.G.O. The CASA further noted R.O.'s incomplete UAs and missed therapy sessions.

Substantial evidence supports finding of fact 2.26, including, when the circumstances are taken together, a lack of parenting skills. R.O.'s mental health issues are linked with her substance abuse issues. She often uses substances as a way to cope with stress, anxiety, and grief. R.O.'s work on these issues was inconsistent. She began several and completed only some mental health evaluations, and she completed only two to three counseling sessions with a THS therapist. R.O. engaged in mental health counselling while in ERC's PPW program, but never completed the program after two attempts because the first time she was caught with heroin in the treatment facility within the first month and another time she provided a positive UA days before she was set to graduate from the program. At the time of trial, CCS had provided mental health counseling for three months and prescribed medication for the previous six months to address depression. While R.O. made strides with her depression, progress with anxiety, stress, and grief was limited. R.O. did not believe she needed additional assistance with mental health. The trial court was entitled to credit Pennington's concerns about R.O.'s ability to provide a clean and safe environment for K.G.O. and R.O.'s risk of continuing to cope with stress through drug use.

R.O. challenges finding of fact 2.187, which states,

The Court does not find the testimony of PCAP Provider Debbie McBrayer that [R.O.] is ready to have [K.G.O.] returned to her care right now credible. The assertion is not accurate. [R.O.] does not have a plan for how she would take care of [K.G.O.] and meet her needs. [R.O.] would just figure it out once [K.G.O.] was in her care.

R.O. asserts two challenges to this finding of fact. Her first argument amounts to challenging the trial court's credibility finding as to testimony by McBrayer to her

belief in R.O.'s current readiness to have K.G.O. returned to her. McBrayer testified R.O.'s parenting strengths include being "extremely responsive to [K.G.O.] in the moment" and agreed that she has seen R.O. prioritizing "[K.G.O.] over other things." McBrayer testified that she never went more than approximately six weeks without contact with R.O. Visits between K.G.O. and R.O. went well, and McBrayer believed R.O. was ready for overnight visitations based on the amount of time McBrayer had spent with R.O., the trial return home at ERC, and the fact that R.O. remained committed to K.G.O. But McBrayer testified she was familiar with R.O.'s history of substance use on "a very need-to-know type of basis." In response to the court's questioning, McBrayer agreed that continued sobriety is an important part of ongoing stability and in general would be concerned to learn of a client declining UA requests. She agreed that if she believed R.O. was still abusing substances, she would not testify that she believed it would be safe to place K.G.O. with her.

Pennington disagreed with McBrayer's testimony that R.O. was ready to care for K.G.O. Based on R.O. failing to be consistent with drug and alcohol treatment and failing to appear for UAs, Pennington did not know if R.O. had maintained her sobriety. She explained, "It's concerning if a parent misses multiple UAs because generally when a parent is using that is when they're not showing up to UAs." R.O. had not completed any of the approximately 11 UAs Pennington had referred her to since April 2022. Pennington testified she did not believe R.O. had addressed her mental health issues. This court does not weigh the evidence or judge the credibility of any witnesses. M.R.H., 145 Wn. App. at 24. The trial

20

court was entitled to credit Pennington's assessment of R.O.'s readiness and discredit McBrayer's.

R.O. downplays her lack of a specific plan to care for R.O. as a basis for finding she was not ready to have K.G.O. returned to her in the near future. R.O. believed she was able to safely parent K.G.O. at the time of trial because she "really thrive[s] with kids," her "visits are excellent," and "[k]ids are just easy." But should she relapse again while K.G.O. was placed with her, R.O. testified she would "[p]robably reach out for help from" K.G.O.'s current caregivers. R.O. also cites her ability to parent M.S. with "minimal intervention" as evidence that she therefore can also parent K.G.O. The trial court was not required to credit K.G.O.'s anticipation of her own readiness. At the time of trial, M.S. was 17 years old and K.G.O. almost 3 years old, and R.O. cites no part of the record, and we have found none, addressing her parenting capability towards M.S. CASA Sendil's testimony supports a conclusion that the daily needs of a 3 year old child are far different and far greater than those encountered during visitation. To the extent it was before the court, R.O.'s level of parenting capability toward M.S. was not determinative, and R.O.'s testimony supported a lack of a plan to care for K.G.O. in case of R.O.'s relapsing.

R.O. challenges findings 2.153 and 2.185, which state,

> 2.153 Clear, cogent, and convincing evidence establishes that there is little likelihood that conditions will be remedied so that the child can be returned to [R.O.] in the near future.
>
> . . . .

2.185 There is little likelihood that [R.O.] will be able to successfully address her substance use disorder so that she can safely parent [K.G.O.] in the near future.

R.O. does not challenge the trial court's finding that K.G.O.'s foreseeable future is, at most, three months. The predominant concern affecting R.O. is her long-term substance use. After K.G.O. was born, R.O. lived with her sister and other adults in a home later determined to be an unsafe residence for R.O. and K.G.O. because of the multiple unapproved adults in the home and current drug users. After relapsing and being removed from a treatment center in late June 2020, R.O. returned to that residence despite the Department deeming it unsafe. Pennington testified she did not believe K.G.O. would be able to be returned to R.O. within the next year because R.O. cannot demonstrate longer periods of sobriety. R.O. had sometimes maintained sobriety for shorter periods but had never done so for as much as six months during the almost three year dependency. R.O. testified that one and a half years is the longest period she had remained sober since age 11. This occurred as early as when she was pregnant with M.S., which could mean as long as about 15 years before the termination trial. R.O. never successfully completed substance use treatment after K.G.O. was removed from her care. In the approximately 30 months between the entry of the September 2020 dependency order to trial in March 2023, R.O. attempted treatment six times. She used in December 2020, January 2021, February 2021, May 2021, June 2021, December 2021, April 2022, May 2022, June 2022, in the fall of 2022, November 2022, and December 2022. While R.O. testified she had been sober since December 2022, she never provided a UA to the Department after being ordered

to do so in April 2022. The trial court was entitled to interpret the lack of current UAs as meaning it could not determine how R.O. was doing in treatment at CCS or had complied with the program's requirements. Findings 2.153 and 2.185 are supported by substantial evidence. Accordingly, the six elements of RCW 13.34.180(1) are supported by substantial evidence.

R.O. challenges finding of fact 2.189, which states: "[R.O.] is currently unfit to parent." Several witnesses testified R.O.'s long-term substance abuse issues, repeated relapses, failed UAs, and related mental health issues remained a concern as to R.O.'s fitness to parent K.G.O. But much of the Department's evidence was conclusory. The CASA testified she did not believe R.O. could provide a safe and stable home "at this time," but also testified there was no instance during her single visit where she was concerned that R.O.'s substance use put K.G.O. at risk. On cross-examination, the CASA was unable to describe any parental deficiencies beyond lack of progress in services:

> Q.   What do you believe [R.O.'s] parenting deficiencies are?
>
> A.   I feel like . . . we would not be here if she was being consistent with her services, and made consistent progress.

The Department caseworker's testimony seems to broadly characterize R.O.'s substance use as a safety threat to K.G.O.:

> Q    Why did the Department file a termination petition?
>
> A.   We filed a termination petition because [R.O.] still had not mitigated the identified safety threat on the case, and she had not mitigated her parental deficiencies.
>
> Q.   What was the identified safety threat for [R.O.]?

  A.  Safety threat No. 5.

  Q.  Which is?

  A.  Caregivers will not or cannot control their behavior, and their behavior impacts child safety.

  Q.  What's the basis for that safety threat applying to this case?

  A.  [R.O.'s] substance use.

Some of the caseworker's testimony explaining how R.O.'s substance use affected her parenting ability was almost entirely circular:

  Q.  Does [R.O.] suffer from substance use?

  A.  Yes.

  Q.  And does that render her unsafe to parent her child?

  A.  Yes.

  Q.  Why?

  A.  [R.O.] struggles with being a safe parent when she's using substances and being a consistent parent who's able to meet all the needs of the child.

At oral argument, the Department contended R.O.'s use of methamphetamines, heroin, and fentanyl pose a danger to K.G.O. because any exposure could potentially be fatal to K.G.O., but no witness said that.[6] The Department never called a witness who testified R.O.'s long-term, unsuccessfully treated substance use posed a specific risk of harm to K.G.O.

---

[6] Wash. Court of Appeals oral argument, In the Matter of the Parental Rights to K.G.O., No. 85453-4-I (Mar. 8, 2024), at 17 min., 47 sec. to 18 min., 31 sec., https://tvw.org/video/division-1-court-of-appeals-2024031208/?eventID=2024031208.

However, R.O.'s early acknowledgments about the severity and impact of her substance abuse issues and inability to make demonstrable progress to resolve those issues after almost three years support the Department's argument in this case. Through the agreed shelter care and dependency orders, K.G.O. acknowledged her substance use history and agreed the services and disposition ordered were necessary and appropriate. R.O. admitted her substance use makes her less capable at parenting and has impacted K.G.O. because "I haven't been there. She doesn't live with me." R.O. understood she needed services in order to have K.G.O. returned to her care. R.O. testified she did not have a relapse prevention plan and if she felt the need or urge to use, she would try to look at videos and pictures of K.G.O. to remind her why she should maintain sobriety. R.O. had been using this technique since the beginning of the case. The record supports the witnesses' testimony that R.O. failed to make progress addressing her substance use issues in about 30 months, given the six failed treatment programs, several failed or incomplete UAs, and self-reported drug uses throughout the lifetime of the case. R.O.'s most recent drug use was just three months before trial, and R.O. had not provided a UA since at least two months before trial. The record supports that parenting a three year old child unsupervised for several hours a week is not equivalent to parenting a child at all times. R.O. had an opportunity to demonstrate her parental fitness with K.G.O. fully back in her care but it lasted only three months, from October 2021 to December 2021, because R.O. failed a UA, was dismissed from her treatment program, and subsequently lost housing again. Beyond the fact of R.O.'s substance use, the

25

evidence produced in this trial demonstrating her failure to maintain an acceptable setting for K.G.O. is evidence of R.O.'s inability to maintain consistent parenting and supports the trial court's finding of current unfitness. Since that trial return, R.O. failed further treatment programs, continued to fail to submit or pass UAs, and continued to use. Despite the over-generality of much of the Department's evidence, finding of fact 2.189 is supported by substantial evidence.

R.O. argues, "Simply because drug use may impact the ability to safely parent does not establish that it does so in a given parent's case." She compares her case to cases such as In re K.A.M., in which the State of Oregon argued a mother's cannabis use "presented a reasonable likelihood of harm to her two children." 236 Or. App. 436, 439, 236 P.3d 791 (2010). There, the state responded to a report of a drug transaction having occurred in the family home, the mother "denied any drug abuse," but then the mother voluntarily supplied a UA that was positive for cannabis. Id. The mother admitted using cannabis a week or two earlier, but denied frequent use. Id. She later provided a negative UA and missed another. Id. at 439-40. The Oregon Court of Appeals reversed the trial court's assertion of jurisdiction over the children, stating, "The record lacks evidence showing that mother's use of [cannabis], her 'chemical abuse problem' as found by the trial court, is a condition or circumstance that poses any risk to her children." Id. at 442. Beyond the mother's single positive UA, the balance of the evidence was that "the parents' home was 'clean' and there was appropriate food for the children in the home; both children appeared happy and healthy. A [Department of Human Services] worker testified that mother 'appears to have appropriate

parenting skills.' " Id. at 439. The contrast with R.O.'s inability to abstain from methamphetamine use throughout her adult life makes K.A.M. more supportive of the Department's position in this case. Here, the trial court had sufficient evidence to find that R.O.'s methamphetamine use created an inability to provide consistency that was unsafe for K.G.O.

B

Under step two of K.M.M., R.O. argues the trial court erred in finding termination of her parental rights was in K.G.O.'s best interests and challenges the following findings of fact:

> 2.202  It is in the best interest of the child that all of the parental rights of [R.O.] be terminated under RCW 13.34.180 and .190.
>
> . . . .
>
> 2.226  The court finds by a preponderance of the evidence, that it is in the best interests of the child that [R.O.]'s parental rights be terminated so that the child can be adopted and achieve permanency.

R.O.'s argument under this step relies on two main arguments: (1) "[t]he evidence fails to show any harm to [K.G.O.] caused by [R.O.] that could begin to compare with the devastating harm of losing her mother," and (2) "[t]here was no expert testimony that the disruption [K.G.O.] experiences with changes of caregiver would be worse than the acknowledged harm of losing her mother."

" 'When it is eventually possible but not imminent for a parent to be reunited with a child, the child's present need for stability and permanence is more important and can justify termination.' " E.D., 195 Wn. App. at 689 (quoting In re Welfare of C.B., 134 Wn. App. 942, 958-59, 143 P.3d 846 (2006)). And when the

27

trial court determines that the parental bond does not outweigh the child's need for permanence, a trial court's finding that a parent's continued involvement in a child's life would be positive does not preclude a finding that termination of parental rights is in the child's best interest. Id. at 697. " 'Where a parent has been unable to rehabilitate over a lengthy dependency period, a court is fully justified in finding termination in the child's best interests rather than leaving [the child] in the limbo of foster care for an indefinite period while [the parent] sought to rehabilitate himself.' " In re Dependency of J.D.P., 17 Wn. App. 2d 744, 767-68, 487 P.3d 960 (2021) (alterations in original) (internal quotations omitted) (quoting T.R., 108 Wn. App. at 167). "No child should languish for years in foster care." In re Welfare of H.S., 94 Wn. App. 511, 530, 973 P.2d 474 (1999) (Noting the alternative to termination in that case was not to return the child permanently to the parent, but to continue her dependency indefinitely. The six year old child had been dependent and in foster care since she was three months old.). "Though it is never easy to terminate parental rights when the parent cares for the child and desires to be a good parent, the overriding goal of a termination proceeding is to serve the child's best interests." In re Termination of R.M.P., 191 Wn. App. 743, 757, 364 P.3d 1073 (2015).

R.O. cites In re Dependency of Ramquist, 52 Wn. App. 854, 765 P.2d 30 (1988) for the proposition that "termination is not necessarily in the children's best interests even if the department has established the other factors." The Ramquist court noted RCW 13.34.190 gives the trial court discretion not to grant termination even when the petitioner establishes the elements of RCW 13.34.180(1). Id. at

860. But Ramquist also noted that " '[o]n appeal, we are constrained to place *very strong* reliance on trial court determinations of what course of action will be in the best interests of the child.' " Id. (internal quotation marks omitted) (quoting In re Interest of Pawling, 101 Wn.2d 392, 401, 679 P.2d 916 (1984)). The trial court's findings of fact as to K.G.O.'s best interests are supported.

R.O. challenges finding of fact 2.207, which states,

> [R.O.] has engaged in all court ordered services, but has been unable to make progress in addressing her mental health or substance use issues.

Based on R.O.'s substance use and mental health issues, the trial court had substantial evidence to find that she has not made progress in addressing these issues. As to mental health, R.O. successfully sought treatment and medication for depression but not anxiety, grief, or stress, and she testified that she does not believe further treatment or services are needed to resolve these issues. Meeting special needs like K.G.O.'s can lead to a great deal of stress on a parent. As to substance abuse, R.O.'s inability to complete any substance use program since June 2020 and the trial court's inability to evaluate compliance at the time of trial, because RO failed to provide any court-ordered UAs, supports the trial court's conclusion that no progress has been made. Finding of fact 2.207 is supported by substantial evidence.

R.O. challenges findings of fact 2.224 and 2.225, which state,

> 2.224 [R.O.]'s substance use renders her incapable of being a safe parent for extended periods of time.

> 2.225 [R.O.]'s substance use renders her incapable of being a safe parent even in a controlled environment.

R.O. agreed her substance use has impacted K.G.O. She said this was "[b]ecause I haven't been there" and testified K.G.O. had not been returned to her care because of her inability to follow through with services. R.O. testified she would seek help from the caregivers with whom K.G.O. was placed if she relapsed with K.G.O. in her care. She stated she would make a plan to provide for K.G.O. "once I get her." During the only period when K.G.O. was placed back in R.O.'s care, the Department removed K.G.O. because of a positive UA and R.O.'s denial of using. This occurred while R.O. resided in ERC's controlled environment of its PPW's facility. Pennington testified that R.O.'s substance use renders her unsafe to parent K.G.O. because she struggles when using substances to be "a consistent parent who's able to meet all the needs of the child." The CASA testified that her recommendation was that adoption was in K.G.O.'s best interest. The CASA did not believe R.O. could provide a safe and stable home. Substantial evidence supports findings of fact 2.224 and 2.225.

R.O. challenges finding of fact 2.223, which states,

[R.O.] cannot provide [K.G.O.] with the stability and routine that [K.G.O.] needs.

Finding of fact 2.223 is supported by substantial evidence because the trial court was entitled to find that R.O.'s long-term substance abuse prevents her from providing K.G.O. the stability and routine she needs.

R.O. challenges finding of fact 2.217, which states,

Consistent, positive visitation is not enough to allow the status quo to continue.

30

In E.D., the parent engaged in substance use and committed criminal offenses, successfully completing an in-patient drug treatment program, but relapsing shortly after. 195 Wn. App. at 679. The parent's efforts to build a relationship with the child had been positive and consistent, even while incarcerated, and included visits as frequently as incarceration permitted and sending letters and gifts to the child. Id. at 684. Despite these and other findings of fact that were favorable to the parent, the court terminated parental rights because the child was 18 months old and deserved permanency in the near future, and continuing the parent's involvement in the child's life was not in the child's best interest. Id. The parent argued the court misapplied the best interest of the child standard by finding that continuation of the parent-child relationship " 'would be positive' " while simultaneously finding that termination was in the child's best interest. Id. at 696. The E.D. court disagreed, noting, " 'When the rights of basic nurture, physical and mental health, and safety of the child and the legal rights of the parents are in conflict, the rights and safety of the child should prevail.' " Id. (quoting RCW 13.34.020). There was no indication that the court misapplied the correct standard by concluding the parental bond did not outweigh the child's need for permanence. Id. at 697.

Here, the trial court found R.O. loves K.G.O. very much, K.G.O. loves R.O., and the "two share a strong bond and visits are generally positive." K.G.O. struggles with transitions, benefits from routine, and experiences emotional dysregulation when her routine changes. K.G.O. visited with R.O. three times a week, those visits formed a part of K.G.O.'s current schedule and losing those

visits would be disruptive for K.G.O. Nevertheless, the trial court also found it "is not in the best interests [of] a child to maintain a schedule if the schedule does not serve her," and R.O.'s longstanding substance use and mental health issues inhibit returning K.G.O. to R.O.'s care. Like in E.D., we cannot say the trial court erred by finding the parental bond R.O. and K.G.O. share does not outweigh K.G.O.'s need for permanence. Finding of fact 2.217 is supported by substantial evidence.

R.O. cites several dissenting Supreme Court and Court of Appeals opinions and relies on trial testimony that discuss "general research and growing consensus by lawmakers regarding the harm of removal." While these opinions may provide some support for R.O.'s argument, the trial court's paramount consideration in a termination proceeding is the moral, intellectual, and material welfare interests of the child. In re Dependency of O.R.L., 191 Wn. App. 589, 597, 364 P.3d 162 (2015). That the removal of K.G.O. permanently from R.O.'s care may harm K.G.O. discounts the harm that can result to the loss of permanency and stability should K.G.O. remain "in limbo" indefinitely while R.O. continues to try and make progress on her parental deficiencies. See J.D.P., 17 Wn. App. 2d at 760, 767-68; E.D., 195 Wn. App. at 689. R.O. does not cite authority supporting her claim that a social worker's "generalized assumption that 'permanency for a child outweighs and is more important than their bond with a biological parent' is insufficient to outweigh the demonstrated harm to the child from termination."

Because substantial evidence supports the trial court's findings of fact on both steps under K.M.M., because of the deference we afford to the trial court, and

in spite of significant shortcomings in some of the evidence, R.O. has not shown error by the trial court in terminating R.O.'s parental rights.

Affirmed.

_____
Birk, J.

WE CONCUR:

_____          _____
Coburn, J.                                    Brennan, J.