# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON
## DIVISION ONE

| | |
|---|---|
| In the Matter of the Dependency of ) | No. 71241-1-I |
| ) | consolidated with |
| G.G., JR., b.d. 11/07/04, ) | No. 71242-0-I and |
| J.D.G., b.d. 09/30/03, ) | No. 71243-8-I |
| S.M.M., b.d. 11/23/99, ) | |
| ) | |
| Minor Children. ) | |
| _____) | |
| ) | |
| DEPARTMENT OF SOCIAL AND ) | |
| HEALTH SERVICES, ) | |
| ) | |
| Respondent, ) | |
| ) | |
| v. ) | ORDER DENYING MOTION |
| ) | FOR RECONSIDERATION, |
| ITZEL JIMINEZ SALAZAR, ) | WITHDRAWING & REPLACING |
| ) | OPINION |
| Appellant. ) | |
| _____) | |

Appellant filed a motion for reconsideration of the court's December 1, 2014

opinion. Legal Voice filed an amicus brief in support of appellant's motion. Respondent

Department of Social and Health Services filed an answer. The court has considered

the motion, the amicus brief, and the answer and determined that reconsideration

should be denied, but that the opinion should be withdrawn and a replacement opinion

filed.

The opinion has been changed by replacing the first full paragraph on page 17

with the following:

"Salazar next challenges the court's finding that her poor relationship
choices render her unfit to parent. The trial court found:

2.24    The mother's parental deficiencies included impaired
        judgment in her relationship choices, which is likely a result of
        her cognitive impairments.  The mother's relationship choices
        place her and her children at risk of domestic violence.[fn]

The record supports this finding.  Although domestic violence victims face great challenges, a parent must exercise good judgment to avoid genuine risk of harm to her children.  Here, the focus of the trial court's finding was not based on Salazar's status as a domestic violence victim; it was her failure to make appropriate choices and participate in recommended services to address parental deficiencies related to domestic violence trauma that placed her children at risk of harm.
Fn. Clerk's Papers at 11."

The opinion was further changed on page 18 by deleting from the fourth

sentence in the first full paragraph the phrase "and that she was later involved in

a domestic violence incident where she was found to be intoxicated."

Now, therefore, it is hereby

ORDERED that appellant's motion for reconsideration is denied.  It is further

ORDERED that the opinion of this court filed December 1, 2014 is withdrawn and

a replacement opinion is filed.

Dated this 9th day of February, 2015.

Trickey, J


# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Dependency of<br><br>G.G., JR., b.d. 11/07/04,<br>J.D.G., b.d. 09/30/03,<br>S.M.M., b.d. 11/23/99,<br><br>Minor Children. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 71241-1-I<br>consolidated with<br>No. 71242-0-I and<br>No. 71243-8-I |
| DEPARTMENT OF SOCIAL AND<br>HEALTH SERVICES,<br><br>Respondent,<br><br>v.<br><br>ITZEL JIMINEZ SALAZAR,<br><br>Appellant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | PUBLISHED OPINION<br><br>FILED:  February 9, 2015 |

VERELLEN, A.C.J. — Itzel Jiminez Salazar appeals from an order terminating her parental rights to her three children. She contends that she was deprived of her right to counsel of choice when the trial court denied her motion for a continuance to hire private counsel. But because she had not selected substitute counsel and failed to show that she had the ability to obtain substitute counsel, the trial court did not violate her right to counsel of choice or abuse its discretion. She further challenges the court's finding that she was unfit to parent. Because the record supports the court's finding of unfitness, her challenge to the termination order is without basis. Accordingly, we affirm.

FACTS

Itzel Jiminez Salazar gave birth to S.M. on November 23, 1999, when she was 15 years old. S.M.'s father was not involved with S.M. and ultimately relinquished his parental rights. Salazar lived with her mother during this time but eventually moved out of her mother's home with S.M. when she was 17 years old. According to Salazar, her mother physically and verbally abused her while she was a minor living in her home.

Salazar had two more children with Gerardo Guizar, whom she married in 2003. J.G. was born on September 30, 2003, and G.G. was born on November 7, 2004. During the marriage, there were several incidents of domestic violence requiring police intervention and, in 2005, Salazar left Guizar and obtained a protection order against him. That same year, Salazar sent S.M. to live with her mother because she was unable to care for all three children.

By 2009 or 2010, Salazar, J.G., and G.G. had moved in with Salazar's mother and S.M. Sometime in 2010, Salazar moved out of her mother's home, taking J.G. and G.G. with her. She left S.M. to remain living in the home with her mother and her younger brother. In March 2011, J.G. and G.G. disclosed to Salazar that they had been sexually assaulted by Salazar's brother while they were living with her mother. Salazar reported this to the police and Child Protective Services (CPS), but she did not remove S.M. from her mother's home. Salazar's brother continued to live in the home and pleaded guilty to assaulting J.G. and G.G. in 2012.

In June 2011, Salazar left J.G. and G.G. in her roommate's care while she was at work as a cocktail waitress. After her shift, she drank until she blacked out and did

2

not return home that night. The next morning, her roommate called the police and CPS when she was unable to locate Salazar. All three children were taken into protective custody and placed in foster care.

On June 10, 2011, the State filed a dependency petition. On July 27, 2011, the court found the children dependent as to Salazar and maintained the children's placement in out-of-home care.[1] The court also ordered remedial services and required Salazar to participate in a drug/alcohol evaluation, random urinalysis testing (UA) and parenting classes. The order allowed Salazar to have a minimum of two hours supervised visitation once per week.

From October 2011 to December 2012, Department of Social and Health Services (Department) social worker Matthew Shaw worked with Salazar to comply with the court-ordered service requirements. He referred her to service providers and scheduled weekly meetings with her, but she often failed to show for the meetings and never provided proof that she participated in any of the services. Salazar had not participated in intensive outpatient alcohol treatment as recommended by the court-ordered evaluation. In fact, she told Shaw that she was working as a cocktail waitress in a bar and asked that he not share that information with her treatment provider. And while she claimed to be involved in parenting classes, she never provided Shaw any proof of her participation.

Salazar's visitation with her children during this time was inconsistent. She had weekly two-hour visits scheduled with them but struggled with logistics and was

---

[1] The court also found the children dependent as to the father on September 22, 2011.

3

often late or failed to appear for visits, causing stress for the children and escalation of their behavior. Shaw spent a considerable amount of time addressing visitation logistics with little change in Salazar's behavior.

Shaw gave Salazar referrals for court-ordered mental health counseling, but Salazar did not participate in counseling. She would either deny needing counseling or falsely report that she was participating in counseling or trying to. She never provided documentation of her participation, nor were any of the providers able to confirm that she had kept appointments or completed intakes.

All three children received services. J.G. required more extensive services due to her extreme behaviors.[2] When Shaw attempted to explain to Salazar the severity of the children's behaviors, she was overwhelmed. According to Shaw, Salazar needed to play an active engaged role in trying to stabilize the children's behaviors in their placements; but instead, she simply reacted and lacked an awareness of the severity of their trauma. She constantly struggled to set limits with them and escalated their behavior by failing to be on time or to show up for the visits. J.G. was particularly traumatized by Salazar's missed visits. She was assaultive at times and often took weeks to recover after a missed visit. Because Salazar's transient involvement was too disruptive to the treatment team working to stabilize the children, she was never introduced into the children's therapy. In July 2012, the court ordered that visitation be reduced to a single two-hour visit per month, finding it necessary to protect the children's health, safety and welfare.

---

[2] J.G. required hospitalized inpatient psychiatric care and was later placed in a behavior rehabilitation services center after an unsuccessful placement with S.M.

4

In September 2012, Shaw recommended that Salazar participate in a second alcohol evaluation. He did so based on concerns about her failure to participate in alcohol treatment and involvement in a domestic violence incident where she was found to be intoxicated in March 2012. Salazar completed the evaluation, but no treatment recommendations were made, leading Shaw to believe that she may not have been honest in this evaluation.

On December 12, 2012, the court held a permanency planning hearing. The court found that Salazar had only partially complied with court-ordered services as she had completed a drug/alcohol evaluation but had not participated in parenting classes or mental health counseling. The court also found that Salazar had not visited the children on a consistent basis, noting that she only recently resumed visits after not visiting for over five months. In addition to the previously-ordered services, the court ordered a psychological evaluation with a parenting component. The court further ordered that the Department make a referral for termination of her parental rights by January 15, 2013.

In January 2013, social worker Sanna Olsen was assigned to Salazar's case. Salazar declined to participate in weekly meetings with Olsen and only met with her every other month and by telephone and e-mail. Olsen referred Salazar to Dr. Michael O'Leary for the psychological evaluation.

In March and April of 2013, O'Leary conducted an evaluation which included psychological testing, a clinical interview, and a parent-child observation. O'Leary concluded that Salazar had impaired functioning in areas involving her ability to organize a household, to timely meet her obligations, and to remember instructions.

He determined that she had limited cognitive functioning which may have been caused by complex trauma she experienced growing up in an abusive environment. He concluded that she would need to participate in very intensive psychiatric and mental health care for two to four years to overcome the trauma. He identified her parenting deficiencies to include cognitive problems, a pervasive distrust and suspicion of others' motives, and willingness to accept abusive behavior from others. He concluded that Salazar was "marginally capable of providing an adequately stable, structured, safe, and consistently nurturing environment for her children at this time."[3]

O'Leary recommended that she participate in trauma-based cognitive behavioral therapy (CBT). O'Leary also concluded that she would benefit from parenting instruction, such as a parenting coach. Olsen referred Salazar to community agencies offering CBT, but she did not participate in any such therapy despite her representations to Olsen that she was doing so. Olsen did not offer the parent coaching service recommended by O'Leary since Salazar was not regularly attending her visits, the setting in which parent coaching would need to occur. During Olsen's time on the case, Salazar continued to struggle with keeping her visit appointments and in five months had only two visits with J.G., one of which was part of the psychological evaluation. During the visits, she was unable to set limits and effectively manage the children's behavior.

On April 4, 2013, the State filed a petition for termination of the parent-child relationship. On May 9, 2013, the court held a review hearing and found Salazar in

---

[3] Ex. 22 at 16.

partial compliance as she had completed the psychological evaluation, but also found that she had not confirmed her participation in counseling or parenting classes, had not attended meetings relating to her children or visited her children since December 14, 2012, and had not met with Olsen since February 2013. The court then ordered that she attend all meetings regarding her children, follow recommendations of the psychological evaluation, including obtaining a sponsor, attending 12-step meetings, and participating in CBT counseling, domestic violence support groups, and the children's therapy as recommended. Salazar never provided Olsen with any evidence that she participated in these services.

In mid-May 2013, Salazar's case was transferred to social worker Morgan White. In June 2013, White met with Salazar, and they discussed services. Salazar reported that she had attended counseling and completed her parenting class, but she did not present any documentation of this participation. White also asked her to complete a UA that day, but she left without doing so. At a second meeting, White discussed Dr. O'Leary's recommendations, and Salazar reported that she was working with her attorney and that they had located a CBT therapist. She also agreed to participate in a UA but then did not do so. White also provided Salazar with a complete list of required services and available community resources that provide those services.

On September 18, 2013, the court held a permanency planning hearing. The court found Salazar in partial compliance of the ordered services as she had completed a parenting class on May 16, 2013. But the court also found that she had not participated in individual counseling, domestic violence support groups, trauma-

based CBT sessions, family counseling, 12-step groups, had not obtained a sponsor, and had not attended all meetings regarding her children.

The termination trial was set for October 28, 2013. On October 22, 2013, the parties appeared for a preliminary hearing, and counsel for the Department noted that "the mother may have an issue with appointment of counsel."[4] The court declined to consider the matter because it had not been noted on the calendar.

On October 28, 2013, the parties appeared for trial and the court asked Salazar's attorney, Susan Harness, about a possible motion to continue. Harness reported that Salazar had contacted her the day before the preliminary hearing and had asked her to make a motion to withdraw. Harness stated that she had spoken to Salazar since then and that it was her desire to have Harness withdraw and request a continuance for Salazar to hire new counsel. The court asked Salazar for her input. Salazar stated that she felt that she hadn't been well represented and that she wanted her therapist to testify, but that the therapist was not available for two weeks.

The court also asked Salazar if she had found a replacement lawyer. Salazar said she met with one lawyer that she did not want to hire and that she was planning to meet with two more that week. She could not provide the names of the lawyers. The court then asked her to elaborate about the therapist that might be a potential witness. She provided only her first name and said she worked in Lynnwood or Edmonds.

Harness told the court that she wished to continue representing Salazar and that she was prepared to go forward. She also said that this was the first time she

---

[4] Report of Proceedings (RP) (Oct. 22, 2013) at 2.

had been given the contact information for the therapist but that she would call her as a witness if she could contact her. The Department and the attorneys for S.M. and the guardian ad litem (GAL) all objected to the continuance, citing undue delay and the children's need for permanency. The Department also stated that this was the first it had been made aware of the possible therapist witness.

The court denied the motion, noting that the dependency had been pending for more than 27 months, that the termination had also been pending for some time, and that everyone was aware of this trial date. Indeed, Salazar had known of the trial date for four months. The court also concluded that there was no basis for allowing Salazar to hire new counsel and remove Harness from the case:

> The stated reason essentially is that mother is not sure and comfortable about the representation provided by Ms. Harness. That really does not rise to the level to have appointed counsel relieved.
>
> As I think has been attested to by others, Ms. Harness is an experienced and competent attorney in these kind of matters. There really is nothing that has been provided in the record here which would indicate to the contrary as to this particular case.
>
> *The mother has indicated a desire to hire alternative counsel, but this comes on essentially the morning of trial, and there are no specific names offered or even an indication that she has met with these individuals. So that is rather speculative in nature.*
>
> Perhaps the biggest concern is the prospect of this potential witness for the mother, the therapist. Although, one notes that according to the mother this therapist has only been involved in the case for the last couple months it sounds like. So, there may be limitations in terms of her testimony. But the Court would be inclined nonetheless to make accommodations to try to ensure . . . at least the possibility of her being heard from. Accordingly, the Court would be inclined, for example, to allow telephonic testimony regarding that therapist. And if that proves simply impossible, to at least consider possible alternatives. Although, again, this is a case that has been pending trial for some time. Again, this is a rather new development it

sounds like in terms of [the] possibility of her being a potential witness. And, as noted, her testimony I gather would be rather limited in scope.[5]

The court then took a short recess to allow Harness time to confer with Salazar. When court reconvened, Harness indicated that she was ready to proceed.

After hearing testimony from Salazar, the three social workers, Dr. O'Leary, and the GAL, the court granted the termination petition. The court found that Salazar had parental deficiencies of drug and alcohol abuse, cognitive limitations that impact her ability to safely parent and make choices in the children's best interests, an inability to provide stability and consistency, a lack of insight of her children's needs and her own parenting deficits, and impaired judgment in her relationship choices which places her children at risk of domestic violence. The court further found that all services capable of correcting the parental deficiencies were offered and that Salazar chose not to participate in them. The court concluded that there was little likelihood conditions would be remedied such that the children could be returned her in the near future, that Salazar was unfit to parent currently and in the foreseeable future, and that she was incapable of providing the children a permanent and stable home. Salazar appeals.

## ANALYSIS

Salazar contends that by denying her continuance to retain private counsel, the trial court violated her constitutional right to counsel of choice. The Department responds that the right to counsel of choice applies only to criminal prosecutions, not civil proceedings to terminate parental rights, and therefore, Salazar's claim of a

---

[5] RP (Oct. 28, 2013) at 18-19 (emphasis added).

constitutional deprivation is without basis. The Department then argues that the trial court's denial of the continuance was a proper exercise of discretion given the untimeliness of the request. We agree that the trial court properly exercised its discretion by denying the continuance.

Salazar acknowledges that Washington law has not specifically addressed whether a parent in a proceeding brought by the State to terminate parental rights has a right to retain counsel of choice. Instead, she relies on case law interpreting the constitutional right to counsel of choice in criminal prosecutions guaranteed by the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution.

In <u>United States v. Gonzalez-Lopez</u>,[6] the Supreme Court recognized that an element of the Sixth Amendment right to counsel is the right of a defendant who does not require appointed counsel to choose who to represent him. The Court concluded that "the right at stake here is the right to counsel of choice, not the right to a fair trial,"[7] and "that the accused be defended by the counsel he believes to be best."[8] Thus, when assessing a request for substitute counsel, an inquiry into the effectiveness of the counsel sought to be replaced or the prejudice to the defendant by that counsel's representation was unwarranted and improper.[9] Rather, the court held that deprivation of this right occurs "when the defendant is erroneously

---

[6] 548 U.S. 140, 144, 126 S. Ct. 2557, 165 L.Ed.2d 409 (2006).

[7] <u>Id.</u> at 146.

[8] <u>Id.</u> at 140.

[9] <u>Id.</u> at 148.

prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received."[10]

In State v. Hampton,[11] this court recently applied Gonzalez-Lopez to find such a deprivation in a criminal case. In doing so, the court rejected the analysis used in State v. Price[12] and State v. Roth[13] to evaluate a trial court's decision to deny a request for a continuance to obtain substitute counsel. Because the Roth-Price analysis required an inquiry into the legitimacy of the defendant's dissatisfaction with counsel and the potential for identifiable prejudice to the defendant, it did not comply with Gonzalez-Lopez and was therefore improper.[14]

In Hampton, the trial court denied the defendant's request for a continuance to allow his newly retained private counsel to have time to prepare his case.[15] In doing so, the trial court considered the defendant's dissatisfaction with his appointed counsel, counsel's effectiveness, and the potential prejudice to the defendant.[16] This court reversed, holding that under Gonzalez-Lopez, the trial court improperly considered those factors to deny the continuance, requiring the defendant to proceed with appointed counsel in violation of his right to counsel of choice.[17]

---

[10] Id.

[11] ___ Wn. App. ___, 332 P.3d 1020 (2014).

[12] 126 Wn. App. 617, 109 P.3d 27 (2005).

[13] 75 Wn. App. 808, 881 P.2d 268 (1994).

[14] Hampton, 332 P.3d at 1029.

[15] Id. at 1025.

[16] Id. at 1030.

[17] Id. at 1030-31.

Salazar similarly argues that she was deprived of her right to counsel of choice when the trial court denied her a continuance to obtain private counsel after considering the legitimacy of her dissatisfaction with and the competence of appointed counsel. The Department contends that because the Sixth Amendment right to counsel of choice applies only to criminal prosecutions, not proceedings to terminate parental rights, the Gonzalez-Lopez analysis does not apply here.

In Washington, RCW 13.34.090(2) provides the right to counsel in termination proceedings, a right derived from the due process guarantees of article I, section 3 of the Washington Constitution and the Fourteenth Amendment.[18] While the Department is correct that a parent's right to counsel in termination proceedings does not derive from the Sixth Amendment right to counsel applicable in criminal prosecutions, this is a distinction of no consequence. Whether the right to counsel in termination proceedings is derived from the Sixth Amendment or due process guarantees, the parent's right to hire the attorney of their choice is inherent in the right to counsel. As the Supreme Court has recognized, the right to assistance of counsel necessarily includes this right to counsel of choice: "It is hardly necessary to

---

[18] In re Luscier's Welfare, 84 Wn.2d 135, 138, 524 P.2d 906 (1974); In the Matter of Welfare of J.M.,130 Wn. App. 912, 921, 125 P.3d 245 (2005). The Department noted at oral argument that in Lassiter v. Dep't of Soc. Servs., 452 U.S. 18, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981), the United States Supreme Court concluded that it is up to the states to determine the due process standards for counsel in termination cases. Our courts have recognized that "'the full panoply of due process safeguards applies to deprivation hearings'" and that the right to counsel in parental termination proceedings derives from constitutional due process provisions. J.M., 130 Wn. App. at 921 (quoting Luscier, 84 Wn.2d at 137). Lassiter does not diminish the vitality of the due process based right to counsel in termination proceedings.

say that the right of counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice."[19] The right of counsel in termination proceedings established by statute and derived from constitutional due process provisions necessarily includes the right to counsel of choice.

But as recognized in Hampton, a court also retains the right to control its calendar, and the ability of the parent to secure substitute counsel is critical to the exercise of the right to choose retained or volunteer counsel.[20] Here, there was no motion to substitute counsel; Salazar had not reached any agreement with any attorney, retained or volunteer, to represent her in the termination trial. Salazar filed only a motion for a continuance to delay the trial and allow her to interview two attorneys she had not yet met.

The trial court asked careful questions and determined: Salazar wanted to retain substitute counsel but had not yet done so; she interviewed one attorney but did not want that attorney to represent her; she planned to interview two other attorneys within the next week but could not give the trial court the names of those attorneys as she did not have their names with her; the dependency had been pending for 27 months; the termination trial had been scheduled. Salazar knew of the trial date for four months. The Department, the GAL, and counsel for S.M. all opposed a continuance on the ground that the children should not be forced to wait longer for the court to determine whether a termination should be granted.

---

[19] Powell v. State of Ala., 287 U.S. 45, 53, 53 S. Ct. 55, 77 L. Ed. 158 (1932).
[20] Hampton, 332 P.3d at 1028.

Consistent with the observations in Hampton, the trial court announced that because the motion came at the start of the scheduled trial,[21] "there are no specific names offered or even an indication that she has met with these individuals," so the request "is rather speculative in nature."[22]

If Salazar had had new counsel present with her at the time of her motion or could otherwise document that she had obtained new counsel to represent her, then she could have filed a motion to substitute the new counsel rather than merely ask for a continuance to try to find someone other than her appointed counsel to represent her. In such a setting, the trial court could then consider the impact of any delay upon the interests of the children. Because Salazar had not selected new counsel and failed to show she had the ability to obtain substitute counsel, the trial court did not frustrate Salazar's right to counsel of choice or abuse its discretion by denying a continuance.

Salazar also contends that the record does not support the trial court's finding of unfitness based on her parental deficiencies of cognitive impairment, poor relationship choices that put her children at risk of domestic violence, drug and alcohol abuse, and a lack of insight about her children's needs. We disagree.

A court may order termination of parental rights when shown by clear, cogent and convincing evidence that (1) the child has been found dependent, (2) the child has been removed from the parent for at least six months as a result of the dependency, (3) all necessary services, reasonably available, capable of correcting

---

[21] Even if we consider the motion "raised" at the preliminary hearing one week before trial, that was still on the eve of trial.

[22] (RP) (Oct. 23, 2013) at 19.

the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided, (4) there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future, and (5) that continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.[23] Although not an explicit statutory element, the court must also find by clear, cogent and convincing evidence that a parent is currently unfit before terminating parental rights.[24] We give the trial court's decision great deference and will uphold its findings of fact if they are supported by substantial evidence.[25]

Salazar first contends that the evidence did not establish that her cognitive limitations directly impacted her ability to parent, citing case law holding that proof of cognitive impairments alone is insufficient to support a finding of fitness.[26] She points to evidence that she was capable of protecting her children by ending a violent relationship with her husband and by reporting her brother's sexual abuse of J.G. and G.G.

But the following unchallenged findings of fact, now verities on appeal, support the court's findings that Salazar's cognitive impairments impacted her ability to parent and that her refusal to actively participate in services to remediate this deficiency rendered her unfit to parent currently or in the foreseeable future:

---

[23] RCW 13.34.180(1).

[24] In re Dependency of K.R., 128 Wn.2d 129, 142, 904 P.2d 1132 (1995).

[25] In re Dependency of K.S.C., 137 Wn.2d 918, 925, 976 P.2d 113 (1999).

[26] See In re Welfare of A.B., 181 Wn. App. 45, 65, 323 P.3d 1062 (2014).

2.47 In his psychological evaluation, Dr. O'Leary recommended that the mother participate in trauma focused cognitive behavior therapy (CBT). On June 6, 2013, the current social worker Morgan White met with the mother and specifically discussed the recommendation for CBT. Ms. White identified agencies that offer CBT, although she did not identify specific counselors.

2.48 The mother told Ms. White that her attorney arranged for the mother to attend CBT with a qualified therapist. During meetings in July and September, the mother continued to represent to the social worker that she was in counseling; she was not. [27]

. . . .

2.51 The mother completed a psychological evaluation with Dr. Michael O'Leary in April 2013. Dr. O'Leary the mother has significant developmental and cognitive problems that are a barrier to the acquisition of adaptive and appropriate parenting behaviors. He concluded it was highly unlikely the mother would remediate her parenting deficiencies without full and vigorous participation in services.

2.52 In his evaluation, Dr. O'Leary recommended reunification contingent on adequate demonstration of the mother's participation in and benefit from recommended services. At trial Dr. O'Leary recommended termination of parental rights based on the mother's failure to actively participate in services. [28]

Salazar next challenges the court's finding that her poor relationship choices render her unfit to parent. The trial court found:

2.24 The mother's parental deficiencies included impaired judgment in her relationship choices, which is likely a result of her cognitive impairments. The mother's relationship choices place her and her children at risk of domestic violence. [29]

The record supports this finding. Although domestic violence victims face great challenges, a parent must exercise good judgment to avoid genuine risk of harm to

---

[27] Clerk's Papers at 12.

[28] Clerk's Papers at 13.

[29] Clerk's Papers at 11.

her children. Here, the focus of the trial court's finding was not based on Salazar's status as a domestic violence victim; it was her failure to make appropriate choices and participate in recommended services to address parental deficiencies related to domestic violence trauma that placed her children at risk of harm.

Salazar also challenges the court's finding that drug and alcohol issues were a deficiency that contributed to her parental unfitness. This finding is supported by the record. It is undisputed that her children ended up in protective custody because she went on a drinking binge, blacked out, and left the children with a roommate. Salazar's drug and alcohol evaluator recommended intensive treatment. Salazar admitted to Shaw that she took a job at a bar as a cocktail waitress despite this treatment recommendation. While Salazar points to the fact that the second alcohol evaluation made no treatment recommendations, Shaw testified that he had concerns about her lack of honesty. The trial court was entitled to find Shaw credible on this point.

Finally, Salazar challenges the court's finding that she lacked insight about her children's needs to the extent that she was unfit to parent. This finding is supported by the record. Shaw testified that "there was a lack on the mother's part of awareness about the severity of the children's trauma," and while all the professionals working to stabilize the children needed her to "play an active engaged role," she was instead "constantly reacting," was "often late failing or missed visitations which escalated the children in their respective . . . placements."[30] Indeed,

---

[30] Id. at 93.

18

as noted above, the court eventually reduced her visits due to the harmful impact on the children. Still, she did not change her behavior and further limited her engagement with the children, failing to visit them at all between May and November of 2012.

Even if any one of these findings alone did not support a finding of unfitness, the remaining unchallenged findings of fact and the record as a whole support parental unfitness and the order of termination. The trial court found credible the evidence presented at trial that Salazar had parental deficiencies rendering her incapable of providing a stable, safe home for the children, that services were offered to help remedy these deficiencies, and that she consistently failed to participate in the required services.

We affirm.

WE CONCUR: