IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Parental Rights to<br><br>M.A.A.K. | No. 87781-0-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

SMITH, J. — In 2021, the Department of Children, Youth, and Families removed M.A.A.K. from the mother's care because of untreated substance use resulting in ongoing risk of child neglect.  Before trial, R.K. requested a new attorney, and the court denied her request.  At trial, the court closed the courtroom four times to address discharging R.K.'s attorney.  The trial court concluded the Department had offered all the necessary services and R.K. had not remedied her parental deficiencies.  R.K. appealed, claiming the trial court violated her right to a public trial when it closed the courtroom, the trial court abused its discretion when it denied her motion for new counsel, and the Department failed to provide timely and meaningful services.

We conclude R.K.'s right to a public trial was not violated, the trial court did not err when it denied R.K.'s motion for new counsel, and the Department offered all the necessary services in a timely and meaningful manner.

FACTS

Background

R.K. is the biological mother of M.A.A.K. (M), born in 2020, and a teenage sibling, A.K. (A). A was removed from R.K.'s care in 2018. M's alleged father died before M was born. On December 27, 2020, the Department of Children, Youth, and Families (DCYF) received a risk-only intake concerning M. DCYF removed M from R.K.'s care and placed them in licensed foster care.

In September 2021, the court entered an agreed order of dependency. The order noted DCYF made active efforts to coordinate with R.K. to drive her to services, but R.K. was not willing to provide a pickup location. R.K. did engage in some mental health services and part of a psychological evaluation. Despite having three different assessments, no suitable referral placement could be found for R.K. One inpatient treatment provider stated they could not admit R.K. because "they could not meet her complicated needs."

In October 2021, the court entered a dispositional order concerning M. The dispositional order required DCYF to provide services to R.K., including drug and alcohol evaluations and treatment recommendations, random urinalysis, parenting classes, psychological evaluation, and domestic violence victim support services and resources. Lauren Maulden was the assigned social worker on M's case for a period between 2021 and 2022. Maulden testified that she worked with R.K. to help her complete the required services. Maulden stated that she would call, text, and e-mail R.K. regularly and sent R.K. a service letter

every month indicating what services R.K. needed to complete. When R.K. expressed concerns about services being too far away or not accepting new patients, Maulden provided alternative locations and offered multiple times to sit down with R.K. and find a location that fit her needs.

In 2023, Brittany Ramos replaced Maulden as the social worker on M's dependency case. Ramos testified that DCYF offered R.K. help with accessing required services and provided R.K. with monthly service letters. Ramos stated that in addition to the service letters, she tried to contact R.K. by text messages and phone calls. Ramos testified that she had a hard time communicating with R.K. because R.K. often refused to meet with DCYF and when she did communicate via e-mail or text, her messages did not make sense. Ramos also noted R.K. was verbally aggressive in her communications.

In May and June 2023, R.K. participated in a neuropsychological evaluation with Dr. Marnee Milner. Dr. Milner concluded R.K.'s overall intellectual ability was average, but she had cognitive weaknesses, including processing speed. Dr. Milner noted R.K. had cognitive, emotional, social, physiological, and behavioral dysfunction, and her testing was consistent with post-traumatic stress disorder (PTSD). In addition to PTSD, R.K. reported ongoing symptoms of depression, physical and health issues, and anxiety. Dr. Milner suggested R.K. may benefit from:

1. Trauma Based Cognitive Behavioral Therapy AND Dialectical Behavioral Therapy [DBT].
2. A parent coach specifically to address the issues raised in the testing from this evaluation.

3

3. Information provided to [R.K.] will need to be in short simple formats so there are no misunderstandings. She may benefit from information provided both verbally and visually (written, in bullet points).

Ramos testified that, in response to the evaluation, she worked with Dr. Milner to find suitable counseling services for R.K. At the time, R.K. was working with a mental health provider at University of Washington Harborview, and Ramos confirmed R.K. could engage in DBT therapy at that same location so she would not need to change providers. Ramos also referred R.K. to a parenting program. R.K. communicated with the provider, but said she did not feel that she needed the services. In response to Dr. Milner's third recommendation, Ramos reformatted her service letters to R.K. so they were simplified, more structured, and contained bullet points.

Throughout M's dependency, the court held numerous statutorily mandated review hearings. At the first dependency review in January 2022, the court noted R.K. was partially in compliance with her court order and partially correcting the problems that necessitated M's out-of-home placement. The court's order indicated that, despite being offered transportation assistance, R.K. was not regularly and consistently visiting M.

At another dependency review in March 2022, the court stated DCYF was making active efforts to help R.K. engage in remedial services and rehabilitative programs, but R.K. was still only partially compliant. The court also noted R.K. had not been visiting M on a regular basis because she failed to confirm appointments ahead of time, which was required after R.K. failed to appear for

4

several of the scheduled visits. Subsequent dependency reviews noted that R.K. did not attend visitation with M and did not work with DCYF to schedule visits.

In May 2022, DCYF moved for termination of R.K.'s parental rights. In subsequent review hearings in February 2023, and July 2023, the court concluded R.K. was no longer in compliance with the court order or making progress towards completing required services. R.K.'s last visit with M before the termination trial was in June 2023.

<u>Motions Regarding Counsel</u>

R.K. was originally represented by Lacey Noel at her 72-hour shelter care hearing for A in 2018. Noel moved to withdraw a month later, based on R.K.'s request. Noel noted that R.K. "ma[de] derogatory statements, yell[ed], and refuse[d] to listen to advice at all." The court granted Noel's motion in March 2018 and appointed Lorelei Munroe as R.K.'s new counsel. In August 2018, Munroe moved to withdraw at R.K.'s request. The motion was never granted, but in February 2019, Munroe filed a notice of withdrawal and Eric Beckendorf was substituted in as counsel for R.K. In June 2020, Beckendorf moved to withdraw, articulating he had "worked in dependencies for many years, ha[d] worked with very difficult clients successfully and unfortunately has not been able to do so with [R.K.] despite repeated efforts over a significant amount of time." Benckendorf's motion was granted and Rebecca Dombcik filed a notice of appearance in July 2020. What happened to Dombcik is unclear, as she left the case but never filed a notice of withdrawal.

In January 2021, at the beginning of M's dependency case, Nicole Gainey appeared for R.K. In August 2022, Gainey moved to withdraw. At the hearing, R.K. stated the breakdown was because Gainey refused to answer her repeated questions. When prompted, R.K. could not recall any of the questions she had asked Gainey. Ultimately, the court granted the motion and Katie Farden replaced Gainey.

In February 2024, Farden had to withdraw from the case because of a rotation in her office. Bruce Shamulka took over as R.K.'s attorney, but he also had to withdraw because of work-related circumstances. Daewoo Kim substituted in as counsel. In August 2024, R.K. moved to discharge Kim, expressing a breakdown in communication. The court held a hearing on the issue and questioned R.K. as to why she was requesting Kim be discharged. R.K. asserted, "He's been really rude to me and, like, interrupts me, doesn't listen to me." When the court asked for examples, R.K. noted, "I'd have to probably go through my messages and stuff."

The court stated it was "not hearing specifics about a breakdown in communication that is . . . sufficient to warrant appointment of new counsel for [R.K.]." The court reminded R.K. that she had requested new counsel on at least four occasions, and the court previously gave her specific directions about changing her behaviors so she was able to work with counsel, noting there were instances of R.K. verbally abusing attorneys. The court concluded R.K. did not have a basis to discharge counsel, but she could present additional evidence

through a motion to reconsider if she wanted. R.K. did not submit a motion to reconsider.

In October 2024, the court appointed a guardian ad litem (GAL) to investigate R.K.'s ability to participate in the termination case. The GAL concluded that R.K., "while difficult at times to work with, currently can participate in her current dependency and termination cases and that at this time, an ongoing litigation attorney is not necessary." But, the GAL recommended a new attorney be appointed for R.K. because "it seems that the attorney-client relationship between [R.K.] and Mr. Kim has broken down and likely cannot be repaired."

In December 2024, R.K. and Kim jointly moved to allow counsel to withdraw. The court held a status conference, where Kim orally requested he be removed from the case.[1] Before discussions began, the court conducted an *Ishikawa*[2] analysis on the record, then the court cleared the courtroom and indicated it would seal the record. Kim noted a "complete and total breakdown in communication" between himself and R.K. and stated, "[I]t is effectively impossible for me to advocate for my client since I do not see a scenario in which she will talk to me." The court determined it had no reason to believe R.K. would communicate with any counsel and granting the motion would only result in

---

[1] R.K. did not attend this hearing.

[2] *Seattle Times v. Ishikawa*, 97 Wn.2d 30, 640 P.2d 176 (1982).

another trial continuance.[3]  The court denied Kim's motion to withdraw as R.K.'s counsel on M's case.[4]

Trial

Trial began on January 14, 2025.  R.K. appeared via online video conferencing and Kim appeared in person in the courtroom.  R.K. stated she was sick, but she had not gone to the doctor.  After the court took a break so Kim could call R.K., Kim returned and said it was unlikely R.K. would log back on, but Kim noted R.K. told him she wanted to discharge counsel and proceed pro se.  The court stated that it could not grant the motion to discharge counsel because it could not confirm R.K. was knowingly and intelligently waiving her right to counsel.  R.K. briefly appeared back on camera and stated she was not ready to go to trial, but she did not ask the court to discharge counsel or to proceed pro se.  The court found R.K. voluntarily absented herself and denied the motion to discharge Kim.  Trial proceeded without R.K. present.

The next day, R.K. appeared via online video conferencing at the start of the proceeding.  Kim again raised the issue of the joint motion to discharge counsel.  The court stated it would not grant the motion because R.K. no longer joined in the motion, R.K. had not been present for entire first day of trial, Kim was representing her to the best of his ability, and R.K. was in no position to

---

[3]  The trial had been continued eight times since February 2023, and at least two of those continuances were due to a change in counsel.

[4]  The court did allow Kim to withdraw from M's sibling's (A's) case.

represent herself.[5]  But the court declared it would not proceed with R.K. attending via online video conferencing, so it recessed until R.K. could attend in person.  The court instructed DCYF to coordinate with R.K. to make sure she had a ride to court.  Trial continued January 21, 2025, with R.K. present.

On January 27, in the middle of R.K.'s direct examination, Kim moved to withdraw from the case and requested to speak with the court in camera.  The court stated it did not perform in camera conversations, but it would close the courtroom and seal the portion of the record.  Kim said that would be fine.  The court recessed for the day and asked everyone to clear the courtroom except Kim, the bailiff, and the clerk.  Before leaving, DCYF asked the court to conduct an *Ishikawa* analysis before clearing the courtroom, but the court said, "I need to hear what he is going to say before I determine if I'm actually going to seal it. . . . After I hear what he says, then if it's of the nature of which it needs to be sealed, I will do that analysis."  The court further noted, "I am technically kind of pre-sealing. . . . [b]ut if I find that it doesn't meet any of the standards, then I am going to release the information."

The court spoke privately with Kim, then R.K.  Kim claimed discharge of counsel was warranted because R.K. perjured herself by testifying Kim allowed her only two hours to provide him with a witness list.  After talking with R.K. separately, the court determined this was a misunderstanding.  The court then stated on the record that, "in light of the information provided by both [R.K.] and

---

[5] On January 21, Kim and R.K. formally withdrew their motion to withdraw counsel.

Mr. Kim[,] under the *Bone-Club*[6] analysis it is appropriate to seal the conversation." The court noted it would write an order with the *Bone-Club* analysis findings because it did not know the factors offhand.

The next morning at the start of trial, the court again closed the courtroom to discuss its ruling on the motion for discharge with Kim and R.K. Once the courtroom was closed, Kim told the court that R.K. "is possibly the most, in terms of her treatment of me, the most verbally abusive client I've had in 25 years." The court recognized the tough situation Kim was in, but noted the trial was almost over and, despite the challenges, Kim was able to effectively represent R.K. The court asked R.K. if she still wanted to discharge Kim and R.K. declined. Kim stated, "Since [R.K.] is withdrawing her motion, I do not believe that my office would support me making the motion without [R.K.'s] support, so I must, for that reason, withdraw my motion." The court denied the motion and noted it still needed to enter an order, but it was planning on sealing the record.

The court issued its findings, conclusions, and order sealing the record for the hearings conducted January 27 and January 28. The order stated, in pertinent part:

> Prior to the Closure, all persons at the hearing had the opportunity to object to the closing of the courtroom and sealing of the proceedings. No person objected and no objection has been filed.
> . . .
> The Court and the participants analyzed whether the requested method for curtailing access to the information sought to be sealed would be the least restrictive means available and effective in protecting the interests threatened. Closing the courtroom and

---

[6] *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995).

sealing the proceedings is the only means available to protect the interests threatened and is the least restrictive means to do so.

. . .

The Court has weighed the competing interests of the Respondent [Mother] and the public and finds no other way to protect the confidences at issue.

. . .

The Court's order to seal is no broader in its application or duration than necessary to serve its purpose. The Court can envision no time when the information contained in the information to be sealed will no longer need this protection.

On the final day of trial, R.K. again stated she wished to discharge her counsel, and she wanted to add to her testimony. The court reiterated its previous position concerning discharge of counsel but permitted R.K. to supplement the record regarding issues she had with DCYF, including its alleged failure to provide her with the necessary resources.

At the end of trial, the court concluded DCYF provided R.K. with all necessary services and offered R.K. assistance in obtaining those services. The court found R.K. had ongoing mental health and substance abuse issues and she had not consistently engaged in services to remedy these issues. The court noted DCFY tried connecting with R.K. through various methods, including e-mail, written letters, and phone calls. The court reviewed communications between R.K. and her social worker and found R.K. repeatedly refused assistance from DCYF or did not respond at all to DCYF.

The court also noted that after R.K. completed portions of her neuropsychological evaluation and it was recommended communications to R.K. be in a short, simple format, DCYF restructured the service letters to R.K. to

make them easier for her to understand. When R.K. indicated she preferred working with a particular mental health provider, DCYF made adjustments to facilitate that relationship. Ultimately, the court concluded "the factors and allegations contained in the petition have been established by clear, cogent, and convincing evidence," found that it was in the best interest of the child to terminate parental rights by a preponderance of the evidence, and, accordingly, it granted the petition for termination.

ANALYSIS

Public Trial

R.K. contends her right to a public trial was violated when the trial court closed the courtroom without first conducting an *Ishikawa* analysis, and this error requires reversal. We conclude that the right to a public trial did not attach to the discussions between Kim and the trial court and, therefore, the trial court did not violate R.K.'s rights when it closed the courtroom.

An appellate court may refuse to review a claim raised for the first time on appeal. RAP 2.5(a). Even if a claim is not raised at the trial court, a party may raise it on appeal if it is a " 'manifest error affecting a constitutional right.' " *State v. O'Hara*, 167 Wn.2d 91, 94, 217 P.3d 756 (2009) (quoting RAP 2.5(a)). In addition to identifying a constitutional error, the defendant must show how the error affected their rights at trial: "It is this showing of actual prejudice that makes the error 'manifest,' allowing appellate review." *State v. Kirkman*, 159 Wn.2d 918, 926-27, 155 P.3d 125 (2007) (quoting *State v. McFarland*, 127 Wn.2d 322,

333, 899 P.2d 2151 (1995)).  To show prejudice, the defendant must prove

"beyond a reasonable doubt that 'any reasonable jury would have reached the

same result in the absence of the error.' "  *State v. Frost*, 160 Wn.2d 765, 782,

161 P.3d 361 (2007) (quoting *State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d

1182 (1985)).

Whether a trial court violated the right to a public trial is a question of law

reviewed de novo.  *State v. Sublett*, 176 Wn.2d 58, 70, 292 P.3d 715 (2012).

The Washington State Constitution provides, "Justice in all cases shall be

administered openly."  CONST. Art. I, § 10.  The purpose of this provision is to

"guarantee[] the public open access to judicial proceedings and court documents

in both civil and criminal cases."  *In re Dependency of J.A.F.*, 168 Wn. App. 653,

660, 278 P.3d 673 (2012).  The First Amendment[7] also provides the public and

the press an implicit right to access trials.  *Tacoma News, Inc. v. Cayce*, 172

Wn.2d 58, 65, 256 P.3d 1179 (2011).  "[T]he right to a public trial serves to

ensure a fair trial, to remind the prosecutor and judge of their responsibility to the

accused and the importance of their functions, to encourage witnesses to come

forward, and to discourage perjury."  *Sublett*, 176 Wn.2d at 72.

Not all interactions in a courtroom implicate the right to a public trial.

*Sublett*, 176 Wn.2d at 71.  Whether the right to a public trial attaches to a

---

[7] The First Amendment provides, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."  U.S. CONST. amend. I.

13

particular proceeding is determined by considering the "experience and logic

test" established in *Press–Enterprise Co. v. Superior Court of California*, 478

U.S. 1, 8-9, 106 S. Ct. 2735, 92 L. Ed. 2d 1 (1986).  First, the court considers

"whether the place and process have historically been open to the press and

general public."  *Press-Enterprise*, 478 U.S. at 8.  Next, the court determines

"whether public access plays a significant positive role in the functioning of the

particular process in question."  *Id*.  If the answer to both questions is yes, the

right to a public trial attaches.  *Sublett*, 176 Wn.2d at 73.

If the right to a public trial attaches to the proceedings, the court must

apply and weigh the five factors set forth in *Ishikawa* before it can close the court

to the public.  *J.A.F.*, 168 Wn. App. at 678.  The five *Ishikawa* factors are:

1.  The proponent of closure [and/]or sealing must make some showing of the need for doing so, and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a 'serious and imminent threat' to that right.

2.  Anyone present when the closure [and/or sealing] motion is made must be given an opportunity to object to the closure.

3.  The proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests.

4.  The court must weigh the competing interests of the proponent of closure and the public.

5.  The order must be no broader in its application or duration than necessary to serve its purpose.

*In re Dependency of M.H.P.*, 184 Wn.2d 741, 765-66, 364 P.3d 94 (2015)

(alteration in original) (quoting *Allied Daily Newspapers of Wash. v. Eikenberry*,

121 Wn.2d 205, 210–11, 848 P.2d 1258 (1993)).  The court should address each

of the *Ishikawa* factors in its findings and conclusions, and the findings and

conclusions should be " 'as specific as possible rather than conclusory.' " *Doe v. Thurston County*, 4 Wn.3d 906, 920, 569 P.3d 1101 (2025) (internal quotation marks omitted) (quoting *John Doe G v. Dep't of Corr.*, 190 Wn.2d 185, 199, 410 P.3d 1156 (2018)). A failure to articulate the five-factor test in the record results in a violation of the defendant's right to a public trial. *Bone-Club*, 128 Wn.2d at 261.

If a defendant's right to a public trial is violated in a termination case and the issue is raised for the first time on appeal, the defendant bears the burden of showing actual prejudice. *J.A.F.*, 168 Wn. App. at 661-64; RAP 2.5. While prejudice is presumed in criminal cases where a defendant's right to a public trial was violated and the error was structural, a majority of the Supreme Court has concluded the "structural error" analysis does not apply to civil cases. *See In re Detention of D.F.F.*, 172 Wn.2d 37, 47-57, 256 P.3d 357 (2011) (concurring opinion of Johnson, J.) (dissenting opinion of Madsen, J.). Therefore, a defendant in a termination case whose right to a public trial has been violated must demonstrate actual prejudice to warrant reversal. *In re Adoption of M.S.M-P*, 181 Wn. App. 301, 314, 325 P.3d 392 (2014), aff'd, 184 Wn.2d 496 (2015).

The court in a termination proceeding also has discretion to exclude the public if it is in the best interest of the child. RCW 13.34.115(1). Even if the court determines closure is in the best interest of the child, it still must conduct an *Ishikawa* analysis before closing the courtroom *D.F.F.*, 172 Wn.2d at 41-42. Counsel in a termination case "can effectively waive a party's article I, section 10

rights by saying 'no objection' on the record when the judge inquires about closing the court." *In re Adoption of M.S.M.-P*, 184 Wn.2d 496, 500, 358 P.3d 1163 (2015).

Here, DCYF contends the right to a public trial does not attach to closures where the court is "investigat[ing] and mak[ing] informed rulings" on motions to discharge counsel. Applying the experience and logic test, DCYF maintains this type of proceeding has not historically been open to the public, and the presence of the public at such a proceeding would likely have a negative impact on the candor of the parties.

While R.K. correctly notes termination proceedings are presumed open to the public,[8] that presumption does not apply to all interactions that occur in the courtroom during a termination proceeding. For example, disclosure of privileged attorney-client information should be made in the most restrictive means possible. *See* Rules of Professional Conduct (RPC) 1.6, n. 16 ("[T]he disclosure should be made in a manner that limits access to the information to the tribunal or other persons having a need to know it and appropriate protective orders or other arrangements should be sought by the lawyer to the fullest extent practicable.") Such disclosures include an attorney's belief that their client has committed perjury. *See* RPC 3.3(a)(2); *State v. Berrysmith*, 87 Wn. App. 268, 276-77, 944 P.2d 397 (1997) ("RPC 3.3 in conjunction with RPC 1.6 requires attorney to disclose client's plan of perjury to the court if necessary to avoid

---

[8]  *See* RCW 13.34.115.

assisting such criminal act.") (citing *State v. Fleck*, 49 Wn. App. 584, 586, 744 P.2d 628 (1987)).

Here, Kim's request to speak with the court in camera concerning privileged attorney-client information is not the type of interaction that has historically been open to the public. Additionally, it would not promote confidence in the judiciary if attorneys discussed privileged information about their relationship with their client in open court. Instead, this would undermine the client's trust in their attorney and impact the attorney-client relationship, especially in a situation, such as here, where the attorney believed their client committed perjury.

For these reasons, an attorney's discussion with the court where privileged communications between the attorney and their client will be discussed does not satisfy either prong of the experience and logic test and, accordingly, the right to a public trial does not attach. Because the right to a public trial did not attach to Kim's discussion with the court, the trial court did not abuse its discretion when it did not apply and weigh the five *Ishikawa* factors before closing the courtroom.[9]

<u>Right to Counsel</u>

R.K. maintains the trial court abused its discretion when it repeatedly denied her motions to discharge counsel. We conclude the trial court properly

---

[9] Because the right to a public trial does not apply, DCYF's claims that R.K.'s appeal of that issue is not timely and R.K. waived her right to appeal are moot.

considered the relevant factors and its decision was reasonable based on the circumstances of R.K.'s case.

We review a trial court's decision to grant or deny a motion for new counsel for abuse of discretion. *State v. Varga*, 151 Wn.2d 179, 200, 86 P.3d 139 (2004). A court abuses its discretion if its decision is " 'manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons.' " *State v. Holmes*, 31 Wn. App. 2d 269, 279, 548 P.3d 570, (quoting *State v. Vermillion*, 112 Wn. App. 844, 855, 51 P.3d 188 (2002), *review denied*, 3 Wn.3d 1024 (2024).

Parents involved in termination proceedings "have a fundamental liberty interest in the right to parent their children and a constitutional right to counsel when [DCYF] seeks to terminate that right." *In re Dependency of M.S.R.*, 174 Wn.2d 1, 13, 271 P.3d 234 (2012). Indigent parents have a statutory right to legal representation at all stages of a termination proceeding. RCW 13.34.090(2); *In re Welfare of G.E.*, 116 Wn. App. 326, 332, 65 P.3d 1219 (2003). But indigent parents in a termination proceeding do not have the right to "choose a particular court-appointed counsel," nor do they have the right to a " 'meaningful relationship' " with their appointed counsel. *Holmes*, 31 Wn. App. at 279 (quoting *Wheat v. United States*, 486 U.S. 153, 158, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988)).[10] When seeking new counsel, a defendant "must show

---

[10] No Washington Supreme Court case has explicitly addressed the standard that applies to indigent parties in a termination proceeding seeking new counsel. But Washington cases have derived many of the standards that apply to parents in a termination proceeding from criminal proceedings. *See e.g.*, *G.E.*,

good cause to warrant substitution of counsel, such as a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication." *State v. Stenson*, 132 Wn.2d 668, 734, 940 P.2d 1239 (1997). Generally, a loss of trust or confidence in counsel alone is not sufficient to warrant substitution of counsel. *Varga*, 151 Wn.2d at 200. A motion for new counsel will be granted "only when counsel and defendant are so at odds as to prevent presentation of an adequate defense." *Stenson*, 132 Wn.2d at 734.

When determining whether a motion for new counsel should be granted, the court considers "(1) the reasons given for the dissatisfaction, (2) the court's own evaluation of counsel, and (3) the effect of any substitution upon the scheduled proceedings." *Stenson*, 132 Wn.2d at 734. In a subsequent opinion, the Washington Supreme Court adopted the Ninth Circuit's "irreconcilable conflict test" as part of the determination of whether the trial court erred in failing to substitute counsel. *See In re Pers. Restraint of Stenson*, 142 Wn.2d 710, 724, 16 P.3d 1 (2001) (*In re Stenson*). The *In re Stenson* court noted the factors in the test somewhat overlap with the existing test for substitution of counsel test, but "the differences are substantial enough to constitute a new ground for relief." *In re Stenson*, 142 Wn.2d at 724. The factors of the irreconcilable conflict test

---

116 Wn. App. at 326, 333 (applying the same standard for waiver to right of counsel to indigent parents in a termination proceeding as a criminal defendant); *In re Dependency of G.G. Jr.*, 185 Wn. App. 813, 826, 344 P.3d 234 (2015) (noting that even though a parents' rights in a termination proceeding do not derive from the Sixth Amendment, they still have the right to hire the attorney of their choice).

19

are "(1) the extent of the conflict, (2) the adequacy of the inquiry, and (3) the timeliness of the motion." *In re Stenson*, 142 Wn.2d at 724.

Here, while there were clearly issues of communication and trust between R.K. and Kim, the court did not abuse its discretion by denying the motions for discharge. In R.K.'s first motion, in August 2024, the court recognized R.K. and Kim were having difficulties communicating, but when the court asked R.K. for specific examples of Kim's "offensive behavior," R.K.'s one example was that Kim gave her only two hours to compile a witness list—a misunderstanding the court later sorted out. The court stated it did not hear "specifics about a breakdown in communication" sufficient to warrant appointment of new counsel. The court noted R.K. had a history of requesting new counsel and the court had previously given R.K. "specific direction about changing some of [her] behaviors" so R.K. could work better with counsel. The court also considered that M's dependency case had been ongoing for four years and the termination proceeding had already been continued multiple times.

R.K. and Kim jointly moved for new counsel and withdrawal in December 2024, two and a half weeks before the trial date. This time, R.K. and Kim relied on the GAL report recommending the court consider appointing new counsel for R.K. At the hearing on the motion, the court stated its analysis had not changed, even contemplating the GAL's recommendation. The court noted R.K. was not likely to cooperate with a substitute counsel and she was not in a position to

represent herself.[11]  The court also found Kim was able to effectively represent R.K. despite the communication issues.  The court noted that since R.K. appeared at trial, she had sat through the testimony, listened to cross-examination, and appeared to be in agreement with Kim's presentation of her case.  For those reasons, the court denied the motion to withdraw.[12]  Both R.K. and Kim moved for discharge once again before trial ended, and the court reiterated its previous reasoning.

The court considered all the relevant factors including the reasons for the motions, the extent of the communication issues, and how a substitution of counsel would affect the case.  The court recognized the difficult position Kim was put in but concluded Kim was still adequately able to represent R.K. and, based on her history, R.K. would likely not be able to successfully work with any other counsel.  For these reasons, the trial court did not abuse its discretion when it denied the motions for counsel's discharge.

<u>Necessary Services</u>

R.K. contends the trial court erred when it concluded DCYF met its burden of providing the necessary services.  Because substantial evidence existed to prove DCYF provided all the necessary services in a timely and meaningful manner, we conclude the trial court did not err in its decision.

---

[11]  When asked, R.K. indicated she would prefer to continue working with Kim rather than to proceed pro se.

[12]  The court denied the motion as it related to M's case but allowed Kim to withdraw from A's permanency case, finding the trial was four months away and substitution of counsel would not impact the timeliness of resolution.

When a termination decision is appealed, our role in reviewing the decision is to "determine whether substantial evidence supports the trial court's findings of fact by clear, cogent, and convincing evidence." *In re Dependency of G.E.S.*, 23 Wn. App. 2d 337, 349, 515 P.3d 1046 (2022). "Evidence is substantial if, when viewed in the light most favorable to the party prevailing below[,] . . . it is such that a rational trier of fact could find the fact in question by a preponderance of the evidence." *G.E.S.*, 23 Wn. App. 2d at 349. We do not "weigh the evidence or the credibility of witnesses." *In re Dependency of T.R.*, 108 Wn. App. 149, 161, 29 P.3d 1275 (2001). Whether the trial court's findings of fact support its conclusions of law is reviewed de novo. *In re Parental Rights to K.M.M.*, 186 Wn.2d 466, 477, 379 P.3d 75 (2016).

Before a court can terminate a parent-child relationship, DCYF must satisfy its statutory obligations under RCW 13.34.180(1) and offer or provide " 'all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future.' " *K.M.M*, 186 Wn.2d at 479 (quoting RCW 13.34.180). A "necessary service" is one that is "needed to address a condition that precludes reunification of the parent and child." *In re Dependency of A.M.M.*, 182 Wn. App. 776, 793, 332 P.3d 500 (2014). DCYF is required to specify all necessary services in a permanency plan. *K.M.M.*, 186 Wn.2d at 479-80. And "[t]he services offered must be tailored to each individual's needs." *T.R.*, 108 Wn. App. at 161.

22

Here, R.K. contends DCYF failed to offer her the resources specifically recommended in the neuropsychological evaluation. She claims DCYF's only evidence that it fulfilled its obligations were the three service letters sent by Ramos. R.K. does not explain what services were not offered and only contends the service letters were insufficient because they were five pages long.

At trial, evidence concerning the neuropsychological evaluation and, more generally, of services offered came from exhibits and testimony of R.K.'s assigned social workers. The neuropsychological evaluation recommended R.K. engage in specific types of therapy, work with a parent coach, and that DCYF provide R.K. information in a short, simple format. After the evaluation, Ramos worked with Dr. Milner to identify therapy options that would allow R.K. to continue seeing her current therapist. Ramos also provided R.K. with a referral to parenting classes. R.K. had communications with the provider but told the provider she did not feel that she needed the service.

Ramos also changed the format of the service letters after the evaluation by limiting wording and putting the information in bullet points, so everything was structured and easier to read. The letters included a clear description of each of the services R.K. was required to complete and how to engage with those services. Ramos testified that she focused on empathy and support when communicating with R.K., so R.K. would not feel blame or shame. Ramos communicated in each service letter to R.K. that she was willing to help R.K. access the services and was available to answer any concerns or questions.

When making its ruling, the court relied on this information to conclude DCYF offered all necessary services and tried to communicate with R.K. to assist her in completing the services. Accordingly, sufficient evidence existed to support the court's findings that DCYF provided all necessary services.

Sufficiency of the Evidence

In her assignments of error, R.K. contends the trial court erred when it terminated her parental rights because sufficient evidence did not exist to support its findings. But R.K. provides no argument or citations to support this claim. An appellant's brief must contain "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record." RAP 10.3(a)(6). When an appellant fails to provide any authority or cite to the record to support an issue, we may decline to consider it on appeal. *Camer v. Seattle Post-Intelligencer*, 45 Wn. App. 29, 36, 723 P.2d 1195 (1986).

Because the trial court made numerous findings and R.K. does not provide any argument for why the trial courts findings were not supported by sufficient evidence, we decline to address this argument.

We affirm.

WE CONCUR:

24